FILED

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

13 FEB 11 PM 3:07

### CASE NO.: 8:12-CV-2927-T-33TGW

MIDDLE ~~~~~~~ ~~~ FLORIDA
TAMPA, FLORIDA

UNITED STATES OF AMERICA and
STATE OF FLORIDA
ex rel. DAVID WILLIAMS, D.O.,

        Plaintiff/Relator,

v.

HCA HOLDINGS, INC., SHERIDAN
HEALTHCARE, INC., and JACKSONVILLE
EMERGENCY CONSULTANTS P.A.
d/b/a TITAN EMERGENCY GROUP,

        Defendants.

_____/

**FILED UNDER SEAL PURSUANT
TO 31 U.S.C. §3730(b)(2) and
§68.083 Fla. Stat.**

---

**AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF
UNDER THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3730) and
FLORIDA FALSE CLAIMS ACT (§68.083 FLA. STAT.)**

---

S-3

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO.: 8:12-CV-2927-T-33TGW

UNITED STATES OF AMERICA and
STATE OF FLORIDA
ex rel. DAVID WILLIAMS, D.O.,

                Plaintiff/Relator,

v.

HCA HOLDINGS, INC., SHERIDAN
HEALTHCARE, INC., and JACKSONVILLE
EMERGENCY CONSULTANTS P.A.
d/b/a TITAN EMERGENCY GROUP,

                Defendants.

**FILED UNDER SEAL PURSUANT
TO 31 U.S.C. §3730(b)(2) and
§68.083 Fla. Stat.**

_____/

**AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF
UNDER THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3730) and
FLORIDA FALSE CLAIMS ACT (§68.083 FLA. STAT.)**

On behalf of the United States of America and the State of Florida, Plaintiff and Relator, David Williams, D.O. ("Dr. Williams" or "Relator") files this Amended qui tam complaint against Defendants, HCA, Inc. ("HCA"), Sheridan Healthcare, Inc. ("SHERIDAN") and Jacksonville Emergency Consultants, PA, d/b/a Titan Emerngency Group ("TITAN") and alleges as follows:

## I.      INTRODUCTION

### A.  Federal and State Law Claims.

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America and the State of Florida in connection with the systematic overbilling of tests and procedures performed on patients seeking emergency care, in violation of the Federal

False Claims Act, 31 U.S.C. § 3729 et seq. and the Florida False Claims Act §68.081-.09 Florida Statutes (collectively referred to as the "FCAs").

2.     Pursuant to the FCAs, Relator seeks to recover, on behalf of the United States of America and the State of Florida, damages and civil penalties arising from false or fraudulent claims that Defendants submitted or caused to be submitted to government funded health insurance programs. Defendants' pattern and practice of providing unneccesary medical tests and procedures as described herein, led to payments made by Medicare, Medicaid, the Federal employees Health Benefits Program ("FEHBP"), the managed care component of the United States department of Military Health Systems (TRICARE), and the Civiliam Health and Medical Progam of the Department of Veterans Affairs (CHAMPVA) and the Florida Agency for Health Care Administration.

3.     This matter involves a significant fraud on government funded health insurance programs through the systematic overbilling of tests and procedures for patients seeking emergency care.  Defendant HCA, through its hospitals, employees and contractors, designed and implemented a business-like approach to generate unjustified and costly medical procedures that led to overbilling of the Medicare, Medicaid and Tricare programs and created an unnecessary financial burden on patients.  Beyond being unnecessary, many of these medical procedures placed patients at great risk of complications and exposed them to radiation. Defendants TITAN and SHERIDAN, in their role as an outside staffing agency for emergency rooms, overbilled for medical services and otherwise facilitated HCA in committing the fraud.

4.     HCA instituted a greeter system at its hospital emergency room centers to increase its billing to Medicare, Medicaid and Tricare.  These greeters, which are mid-level health care providers, determine what the initial medical complaint is with a patient, and without

any physician interaction, proceed to order a series of tests and procedures based on the initial patient complaint. Based upon HCA protocols, the greeters would determine the tests needed and order them prior to a medical history being conducted. As the tests are ordered and performed without physician approval, the physicians are unable to stop the performance of unnecessary tests. Typically, physicians will see the patients approximately 30-90 minutes later and for the first time see the tests and procedures that had been ordered for the patients. Often, these tests were unnecessary and expensive and in some cases, caused harm to the patients. The tests are ordered by the greeters under a physician's name who is working that day. A physician is then forced to electronically sign for the test verifying that he had approved this level of treatment or face possible suspension or termination. The HCA designed practice gives the deceptive appearance that the physician is the one who ordered the tests when in fact, they did not.

5. The tests and procedures which make up the protocols created by HCA to maximize billing and reimbursements from the government are based upon a patient's chief complaint with total disregard for the true clinical condition. HCA hides or cloaks this fraud in the ruse of patient safety and compliance of core measures created by the government.

6. HCA, TITAN and SHERIDAN also engaged in a practice known as up-coding in its Emergency room billing. Doctors would eventually meet with patients along with scribes who would document the physical exam and history of the patient. The scribes would enter the data into a computer system which also maintained the tests already ordered by greeters. The scribes would use the information to raise the code level of the care received by the patient. All billing submitted for physician care of a patient was billed at a level between one and five with five being the highest billing amount. HCA nurses would also enter patient information into a

hospital data base that would automatically add additional tests and procedures. The doctor would not find out about these additional tests until seeing the patient and reviewing the patient chart.

7.      Despite being made aware of the unethical and fraudulent conduct, Defendants have taken little, if any, action to notify the patients who were unknowingly submitted to unnecessary medical tests and procedures. Instead of making the required refunds to the federal and state governments for these false claims, Defendants have concealed the overpayments that resulted from the scheme and enjoyed the benefits of their fraudulent conduct.

8.      Moreover, instead of making the necessary systemic changes to avoid such pervasive fraud in the future, Defendants have simply continued to bill Medicare, Medicaid and other government agencies for expensive, unnecessary and improper tests and procedures and have falsely certified the medical necessity and appropriateness of those claims.

9.      Defendants have also repeatedly and falsely certified that they are in compliance with the regulatory conditions of participation in Medicare, Medicaid and other government programs, when they know they are not in compliance, thereby knowingly submitting additional false claims to Medicare, Medicaid and other government agencies.

10.      Defendants have violated federal and state law in that they have submitted claims to Medicare, Medicaid and to other government programs for medical tests and procedures which they had reason to know were medically unnecessary, were incompatible with standards of accepted medical practice, and were of no medical value; falsely certified their compliance with the conditions of participation in the Medicare, Medicaid and other government programs when they knew that they were not in compliance with such prerequisites; and failed to return to

federal and state governments such payments that they were not entitled to receive and that they knew they were not entitled to retain.

11.     The end result of these false claims is the unjustified and illegal enrichment of Defendants, and the corresponding loss of tens of millions and possibly over 100 million dollars of taxpayer's funds.  The illegal practices, designed and driven by HCA to increase profits, are pervasive at their other hospitals and medical facilities throughout the United States.

12.     On behalf of the United States of America and the State of Florida, Relator seeks to recover treble damages as well as civil penalties arising from the false claims that defendants caused to be submitted to the United States and Florida, as well as money damages for the wrongful retention of overpayments and refunds that are due and payable to the United States and Florida.

## II.     PARTIES

**The Relator**

13.     Under the FCAs, a person with knowledge of false or fraudulent claims against the Government (a "Relator") may bring an action on behalf of the federal government and himself.

14.     Relator, David T. Williams, D.O., FACEP, FAAEM, is a citizen and resident of Merritt Island, Florida.  Dr. Williams is Board Certified in Emergency Medicine and licensed to practice in Florida, Georgia, Hawaii, Pennsylvania, Montana and Alabama.  Dr. Williams earned his undergraduate degree from the California University of Pennsylvania in 1987.  He attended and completed his medical education at Philadelphia College of Osteopathic Medicine in Philadelphia, Pennsylvania in 1991.  Subsequently, Dr. Williams attended the Naval Aerospace and Operational Medical Institute graduating in February 1993.

15.     Relator uncovered the fraudulent activity while working at the HCA West Florida Emergency room as soon as he began his employment.

16.     All allegations in the Complaint are based on evidence acquired by Relator, independently, and through his own labor and efforts. The information and evidence he has obtained or of which he has personal knowledge, and on which these allegations regarding violations of the False Claims Act are based, consist of his personal involvement in working as a physician in HCA facilities and treating patients, on documents he has received in connection with his employment, and his observations and knowledge of other actions taken pursuant to policy, practice or instruction while working in HCA facilities.

17.     None of the allegations set forth in this Disclosure Statement or in the Complaint to be filed are based on a public disclosure of information in a criminal, civil, or administrative hearing; in a Congressional, administrative, or General Accounting Office report, hearing, audit, or investigation; or from news media. Rather, they are the independent declaration of the Relator.

18.     Relator is an original source of information within the meaning of the False Claims Act, 31 U.S.C. §3730(e)(4)(B).

**The Defendants**

19.     Defendant HCA HOLDINGS INC. (HCA) is publically traded Delaware corporation, headquartered in Tennessee and employs more than 199,000 employees in its 163 hospitals and 110 free standing surgery centers in 20 states and England. Relator's Hospital (West Florida Hospital) is one of 14 hospitals that fall under the HCA North Florida Hospital chain.

20.     Defendant Jacksonville Emergency Consultants, P.A. d/b/a Titan Emergency Group (TITAN) was founded in 1989. Originally, the group's physicians served as

subcontractors staffing a single emergency department in Jacksonville, Florida. As the group grew, it began securing its own contracts, and TITAN's doctors started implementing tactics to increase patient satisfaction and profitability by improving efficiency from triage to discharge. TITAN is a for profit Florida corporation organized under Florida law.

21.    Defendant Sheridan Healthcare, Inc. (SHERIDAN) provides a full line of hospital based clinical and management solutions in the speciality area of Children's Services, Anaesthesiology, Radiology and Emergency Medicine. SHERIDAN is a for profit corporation organized under Florida law.

22.    HCA utilizes emergency department physician groups to staff its emergency rooms across the country. TITAN and SHERIDAN were contracted by HCA's West Florida Hospital. SHERIDAN had worked with the hospital for two years and was then fired. TITAN replaced SHERIDAN. There are many other Physician Groups that HCA utilizes in its hospital emergency rooms including include Apollo MD, EmCare and TeamHealth.

23.    TITAN and SHERIDAN use recruiting agencies to locate board certified doctors and other healthcare professionals. TITAN and SHERIDAN pay an hourly fee to the recruiter who in turn pays the doctors and other healthcare professionals. TITAN and SHERIDAN submit the doctors' bills for services rendered at an emergency room or hospital for payment. The bills they submit which reflect up-coded levels of care are part and parcel of the fraud perpetrated by HCA.

### III.    THE NATURE OF THE CASE

24.    When a patient arrives in the lobby of an HCA hospital emergency room they are met by a mid-level healthcare provider known as a greeter. Most, if not all, greeters are Physician Assistants (PA) or Nurse Practitioners who are supposed to work under the

supervision of a licensed medical doctor. Typical duties of a PA or Nurse Practitioner include taking medical histories, conducting physical exams and following up with patients as they move through the hospital or emergency room. At HCA, the greeters initiate and order a battery of unnecessary tests and procedures without the approval of a physician.

25.     Relator regularly witnessed the greeter interacting with the patients immediately upon arrival at the emergency room. Usually a nurse would be there to take the vital signs of the patient. The greeter determines what issues or problems the patient is experiencing. The greeter then records the time of the initial contact with the patient and the patient's complaint into a computer system. Based on the patient complaint, the greeter orders tests and procedures that are based on protocols set up in a hospital data base called Meditech. These tests and procedures are submitted and performed prior to a medical history or physical examination.

26.     The following are examples of how the greeter system worked at HCA. A 75 year old female patient who was stung by a bee arrives at the emergency room. The patient was greeted at 4:55 PM and multiple tests were ordered at 4:58 PM by the greeter. These tests were ordered prior to any medical history examination and have not been approved by a doctor. On another occasion, a 17 year old female who was complaining of abdominal pain arrives at the hospital emergency room. The patient was greeted at 4:32 PM and multiple tests were ordered at 4:34 PM without a medical history examination or a doctor's approval. The Relator immediately identified this as a problem at the hospital and questioned several other doctors about this practice. The other doctors advised him to go along with this if he wanted to keep his job.

27.     The process of ordering tests and procedures in an Emergency Department environment creates significant profits for the Hospital. In the Emergency Department, charges are not bundled or based upon a capped DRG (Diagnosis-related Group) reimbursement rate.

There are no caps in an Emergency room setting. HCA has streamlined its process of ordering tests through the Meditech system that was created by HCA. HCA in its efforts to comply with proposed reimbursement guidelines by the government has chosen to implement protocols in the Emergency Department that increase unnecessary testing which leads to overbilling of government programs.

28.     The greeter enters the initial patient compliant and tests that were ordered into a database system called Meditech. Meditech is software used by HCA to manage patient records and orders. HCA created panels or protocols that automatically populate when specific patient complaint data is entered. A specific complaint could trigger 20-40 different tests that could be ordered. Greeters were able to select tests and procedures for patients without a complete physical examination or without the approval (or consent) of the emergency room doctor. The cost for unnecessary testing was significant. CAT scans (computerized axial tomography) also known as CT scans, were ordered by greeters using the Meditech protocols. A CAT scan can cost approximately $1,000. The greeters would orders CAT scans for the head, neck and chest of a patient ($1,000 each) without taking a medical history or consulting with a doctor. If a patient complaint matched the protocols for having Sepsis (a potentially life threatening infection) the full Sepsis protocol could cost more than $10,000.

29.     The greeters were able to check off the specific tests or procedures they want done or rely on the panels and protocols that the hospital has established in Meditech. The greeters do not have the level of training to determine which tests should be ordered. In addition to being expensive, the protocols of tests and procedures that were created by Defendant HCA in many instances can cause significant harm to patients by exposing them to unnecessary tests.

Throughout the Relators employment, he consistently questioned the high amounts of unnecessary tests that were ordered by the greeters and nurses.

30.     The greeters created a Computerized Physician Order Entry (CPOE) when orders for tests and other data were entered into the Meditech system. Each test is entered under a physician's name, although the physician did not order the test. No medical history or physical examination will have occurred prior to the tests being ordered. Defendants utilized auditors in the Emergency waiting rooms to monitor and record the time the greeter meets the patient. In many cases, the greeting time was also entered on the Physician Clinical Report that is prepared by greeters and nurses and is ultimately signed by the attending physician.

31.     The Defendants back-dated or back-stamped doctor patient times into the Meditech system. The "door to doc" time is very important for the hospital. Under the Meaningful Use Act, hospitals and emergency rooms are under pressure to meet government standards on performance and deadlines. The Centers for Medicare and Medicaid Services (CMS) established standards that governs the use of electronic health records and allows hospitals to earn incentive payments for meeting specific criteria.

32.     The Meditech system tracks the patients (throughput) and greeter times. Within Meditech, there is a nursing profile called dashboard data that contains nursing triage notes. Nurses and secretaries are trained to alter the time tracking data to reflect that patients are placed in beds prior to the greeter time. This is done because tests are done on patients and then they are placed back in the waiting room. The patient may not be given a bed for several more hours. By doing this, the record would reflect that the patient was placed in an emergency room bed and seen by a greeter before the tests were ordered. The electronic T-System contains the correct time the provider does a history and physical examination of the patient.

33.     When the greeter meets with the patient there is usually a Registered Nurse present.  The nurse takes the vital signs of the patient and enters this information into the Meditech system.  "Reflex orders" kick in when specific data is loaded into Meditech.  The panels and protocols that have been established by HCA in Meditech can elevate the number of tests ordered and increase the evaluation management codes.  These codes are based on medical decision making.  For example, a level one code would be billed at the medical assistant level and a level five (the highest) would be billed by the doctor.  An example of this activity would be a patient who came in with a sore throat.  This would be billed at a level three; however other tests that were ordered could increase this to a level five.

34.     There are several main components to determine the proper billing level for emergency care.  During each component, specific elements must be found to justify a higher billing level.  They include history of present illness, review of systems and a physical exam.  The final component is medical decision-making.  At HCA, this is how medical billing levels can be raised.  In this phase, due to the number of tests ordered by the greeters, the level can reach a level five which in turn means higher charges for hospitals services.

35.     After a patient has been greeted, tests ordered and vital signs taken, a medical history and registration is conducted.  The patient's charts are then placed in a rack and usually within one to two hours, the patient is seen by a doctor.  Once the doctor begins his examination, most if not all tests have been completed and it is too late for the doctor to cancel any unnecessary test or procedure that was ordered by a greeter or nurse.  On multiple occasions the Relator attempted to cancel tests but the hospital system, on each occasion, has overridden his cancellation.

36.    This process creates a situation where unnecessary, costly and potentially harmful tests are being administered to patients.  Based on the protocols set up by the HCA and the use of the greeter to maximize these protocols and billable opportunities, multiple tests that would not have been ordered by the doctor are now carried out before the doctor sees the patient.  The costs associated with this activity are substantial.  The government insurers (Medicare, Medicaid and Tricare) all have a contractual obligation to enrolees and require reasonable documentation that services are consistent with the insurance coverage provided.  At its most basic element, the medical necessity and appropriateness of the diagnostic services provided must be apparent and the services must be reported accurately.  Both of these basic concepts were being manipulated by HCA.

37.    The MMP (Medical Management Professionals) Emergency Physician Documentation Manual outlines Medicare documentation guidelines for evaluation and management services.  MMP is a National firm that provides billing and practice management services to emergency medical physicians.   The MMP's provide guidance to emergency department Physicians on documentation guidelines and requirements for emergency Physicians and other health care professionals.  These guidelines are standard within the medical profession.

38.    Unnecessary tests and procedures can create health risks for patients as well as false positive testing results which lead to more tests, hospital admissions and increased costs.  Unnecessary tests ordered by greeters at HCA have exposed patients to unnecessary radiation exposure[1], risk of infection through IV catheters, hospital infections and possibly death.

39.    HCA instituted and demanded that physicians as well as other employees, follow certain protocols that had been established that added additional costs to patients and government programs and generated additional profits for the hospital.  For example, several protocols,

---

[1] A single CAT or CT scan can expose a patient to 2000 mrem, or roughly 8 times the average annual exposure.

including the Sepsis protocol, which requires an Edwards Catheter and Radiology protocols which mandated that patients receive contrast. Physicians strongly disagreed with the automatic use of Edward Catheters and contrast for Radiology, but were told if they refused to follow the hospital protocols that they would be terminated.

40.     An Edwards Catheter is a central venous catheter that is used to administer medication or fluids, obtain blood tests and directly obtain cardiovascular measurements such as the central venous pressure. HCA protocol is to place the catheter in the internal jugular vein in the neck (the catheter is manufactured by the Edwards Life Sciences Corporation). HCA had purchased and utilizes in its intensive care unit a device that monitors a patient's central venous pressure. This device adds additional costs for the patients and government programs. The Relator questioned hospital officials about inserting the Edwards Catheter in hemodynamically stable patients. A hemodynamically stable patient is one who does not have problems with the physical aspects of blood circulation that include the cardiac functions and peripheral vascular physiological characteristics.

41.     In one particular instance, where a patient came in and was diagnosed by a Physician Assistant with pneumonia and was to be taken to the intensive care unit (ICU). Prior to admittance to the ICU, HCA protocol is that an Emergency Department doctor must insert an Edwards Catheter. In this case the physician reviewed the charts of the patient and argued that the catheter was not needed and questioned why an invasive monitoring device was required for a hemodynamically stable patient. The doctor was told that it was hospital policy. The doctor placed the catheter in the femoral vein (groin area) as opposed to the jugular vein. By inserting the catheter in the femoral vein, the hospital was not able to charge extra for the monitoring device.

42.     HCA attempted to force the Relator to place an Edwards Catheter on a patient with low platelets who was also at a significant risk for uncontrolled bleeding. The Relator refused to do the procedure and it was noted in the Meditech system. The next morning, the Relator received a telephone call from the hospital's Chief Medical Officer who told the Relator if he didn't comply with hospital protocols that he would be terminated.

43.     HCA's radiology protocols mandated that with the exception of CT scanning of the abdomen for kidney stones, all other CT scanning required the use of a contrast agent (a contrast agent is a substance used to enhance the contrast of structures or fluids within the body in medical imaging). The use of contrast is not required in all cases and is an additional expense to the patient. At HCA the CT Technician automatically ordered the contrast and the physician was required to sign for it after the fact.   Additionally, when a physician ordered a transvaginal ultrasound, the Radiology Technician automatically ordered a pelvic ultrasound per the hospital's protocols. The extra tests were often not needed and added additional costs to the patient's bills.  The emergency room physician would be forced to sign for both ultrasound examinations.

44.     The Relator and other emergency room doctors frequently received emails concerning delinquent patient charts that required their signatures. The Relator and other doctors worked for Defendant TITAN which had contracted with West Florida Hospital to provide doctors to the hospital and emergency room. Approximately 94 doctors have worked at the West Florida Hospital during the past two years. Many Physicians left after being forced to sign orders for tests and procedures that they did not order.   In September 2012, Dr. Vernon Sichewski was asked to sign off on mid-level orders and medical records.   He refused based on

not having ordered the tests.  He was released by the hospital from further schedules and was told his pay would be withheld for refusing to sign the orders and records.

45.     In November 2012, the Relator received an email from Greg Makos, West Florida Hospital that contains an email from Valerie Santos, Director, Health Information Management, West Florida Hospital, concerning an increase in delinquency rates for physicians from TITAN. Mr. Makos requested that the Relator review the chart that was contained in the email and urged the recipients of the email to sign the appropriate charts.

The Relator replies to Makos:

*"It appears that there are 1700 tests ordered in Meditech or HPF under my name for 217 patients, many of which I did not personally take care of.  It appears these are tests and treatments that were ordered by the hospital staff and mid-level providers in triage.  I have gone ahead and co-signed these in Meditech but in the future I would like to limit my signatures to patients I actually took care of. Please let me know if there is anything else you need."*

| PHYSICIAN NAME | <30 | +30 | +60 | +90 | +120 | TOTAL |
|---|---|---|---|---|---|---|
| Williams,David Thomas | 48 | 168 | 1 | 0 | 0 | 217 |
| Sichewski,Vernon R | 1 | 66 | 2 | 0 | 0 | 69 |
| Taladriz,Arturo | 1 | 60 | 0 | 0 | 0 | 61 |
| Whyte,Kirk R | 0 | 33 | 0 | 0 | 0 | 33 |
| Tyulmenkov,Valentyn | 0 | 30 | 0 | 0 | 0 | 30 |
| Zaman,Hasanuz | 9 | 29 | 0 | 0 | 0 | 38 |
| Shams Esshaghi,Kiumars | 70 | 17 | 0 | 0 | 0 | 87 |
| Manginani,Sridevi | 14 | 14 | 0 | 0 | 0 | 28 |
| Quiray,Lourdes Ferrer | 1 | 6 | 0 | 0 | 0 | 7 |
| Fitzgerald,Mekeshia S | 47 | 4 | 2 | 3 | 2 | 58 |
| Walker,Sandra L | 5 | 4 | 2 | 0 | 0 | 11 |
| Smith,Bryan J | 0 | 2 | 7 | 56 | 1 | 66 |

| Araya,Christina M | 31 | 2 | 0 | 0 | 0 | 33 |
|---|---|---|---|---|---|---|
| Brady,Craig A | 8 | 1 | 0 | 0 | 0 | 9 |
| Castro,Paul T | 0 | 1 | 0 | 0 | 0 | 1 |
| De La Paz,Yira Larissa | 19 | 1 | 0 | 0 | 0 | 20 |
| Dujour,Roxanne | 11 | 1 | 0 | 1 | 0 | 13 |
| Mayotte,Peter T | 0 | 1 | 98 | 0 | 0 | 99 |
| Muth,Diane M | 12 | 1 | 0 | 0 | 0 | 13 |
| Rao,Rammohan S | 1 | 1 | 3 | 0 | 0 | 5 |
| Saint Fleur,Hurline | 42 | 1 | 0 | 0 | 0 | 43 |
| Schreiber,Michael L | 0 | 1 | 0 | 0 | 0 | 1 |
| Stanley,Katherine K | 0 | 1 | 0 | 0 | 0 | 1 |
| Defour,Fulton G | 2 | 0 | 0 | 1 | 8 | 11 |
| Katharani,Padmani K | 0 | 0 | 0 | 0 | 6 | 6 |
| Baker,Gregory J | 1 | 0 | 0 | 1 | 1 | 3 |
| Buzas,Peter L | 78 | 0 | 0 | 0 | 1 | 79 |
| Snyderman,Jonathan L. | 0 | 0 | 0 | 5 | 1 | 6 |
| Braumiller,Brian M | 0 | 0 | 0 | 1 | 0 | 1 |

46.    TITAN President Raymond Gyarmathy, MD, FAAEM also encouraged the doctors to finalize the charts. Gyarmathy indicated he would hold up payment to the doctor's respective companies if the charts were not finished. HCA billed for services to the patient including laboratory tests and nursing care while TITAN billed for the emergency room doctor.

47.    The Relator questioned HCA personnel about a system containing incomplete or deficient patient files called the Horizon Patient Folder. The Relator was told that this system is also known as the hCare Portal and contains electronic charts of patients. The Relator explained to Registered Nurse Natalie Seaber that the electronic files contained orders for tests put in by

mid-levels and nurses on patients that the Relator never performed a history or physical examination on or even treated.  RN Seaber responded in an email to the Relator:

*Dr Williams,*

> *It appears the mid-level in triage and other mid-levels ordered orders for the patients you assumed care for or oversaw the care by the mid-levels. The responsibility for mid-level orders or any nursing protocols falls to the ED physician. Any further questions Dr. Aleman may be able to assist.*
>
> *Natalie Seaber, RN, BS, CNML*
>
> *Director of Emergency Services*
>
> *West Florida Hospital*

48.	TITAN and HCA compelled doctors to sign orders for unnecessary testing or they would not be paid and effectively terminated for noncompliance.  The Physician's hospital privileges would be suspended according to the medical by-laws and subsequently reported to the state licensing board for suspension of medical privileges for failure to sign medical records. This could cause the Physicians to be faced with disclosure of suspension of privileges and prejudice for noncompliance on future applications for employment.

## IV.	THE FALSE CLAIMS ACTS

49.	The Federal FCA, as amended, provides in pertinent part that:

[A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990...plus 3 times the amount of damages which the Government sustains because of the act of that

person.

31 U.S.C. § 3729(a)(1).

50.     The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

51.     The Florida FCA, as amended, provides in pertinent part that:

> Any person who (a)   Knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval; (b)   Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency; (c) Conspires to submit a false or fraudulent claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid; …(g)   Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to an agency, is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

§68.082 Fla. Stat. (2011)

52.     The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.  No proof of specific intent to defraud is required. Innocent mistake is not a defense to an action under this act." §68.082 Fla. Stat. (2011)

## V.     COST REPORTING AND CLAIMS PROCESSING PROCEDURES UNDER THE MEDICARE PROGRAM

53.     In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 et seq., known as the Medicare Program, as part of Title XVIII of the Social

Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426-1.

54.     Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

55.     CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 413.64. Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

56.     There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them. 42 U.S.C. §§ 1395j-1395w-5. The allegations herein involve both Parts A and B for services billed by the Defendants to Medicare.

57.     Under Medicare Part A, hospitals enter into an agreement with Medicare to provide health care items and services to treat Medicare patients. The hospital, also called a "provider," is authorized to bill Medicare for that treatment. Most hospitals, including the Defendant's hospitals, derive a substantial portion of their revenue from the Medicare Program.

58.     In order to get paid, a hospital completes and submits a claim for payment on a designated claim form, which, during the relevant time period, was or has been designated either as a Form UB-4 (also known as a CMS-1450) or a Form UB-92. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the UB-4/UB-92 to determine whether and what amounts the hospital is owed.

59.     In addition, at the end of each fiscal year, CMS requires hospitals to submit a Form 2552, more commonly known as the Hospital Cost Report, to the fiscal intermediary. The Hospital Cost Report contains information on facility characteristics, utilization data, costs, Medicare settlement data, financial statement data, and cost and charges by cost center. 42 C.F.R. § 413.20(b), 42 U.S.C. § 1395g.

60.     While Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-4s/UB-92s) during the course of the fiscal year, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider and is reported on the annual Hospital Cost Report. This total determines Medicare's liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due to either the Medicare Program or the provider.

61.     Medicare relies on the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than the provider has already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60, and 413.64(0)(1).

62.     A key purpose of the Hospital Cost Reports is to protect the federal government from loss due to mistake or fraud.  Medicare has the right to audit Hospital Cost Reports and financial representations made by program participants to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  However, while Hospital Cost Reports are potentially subject to audit review, it is generally known throughout the health care industry that fiscal intermediaries do not have sufficient resources to perform in-depth audits on the majority of Hospital Cost Reports submitted to them.  It is also generally known through the health care industry that two to three years will elapse from the time Hospital Cost Reports are filed until they are finalized. For these reasons, the cost reporting system relies substantially on the good faith of providers to prepare and file accurate Hospital Cost Reports.

63.     To this end, the Hospital Cost Report, Form 2552, contains the following warning:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

64.     That advisory is then followed by the following "Certification," which must be signed by the chief administrator of the provider or a responsible designee of the administrator:

> CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)
>
> I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility,

ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

65.     In order to get paid from Medicare, providers, like Defendant herein, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated CMS 1500. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS 1500 to determine whether and what amounts the provider is owed.

66.     To this end, the Health Insurance Claim Form, CMS 1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

That certification is then followed by the following "Notice:"

Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## VI.   CONDITIONS OF PARTICIPATION AND CONDITIONS OF PAYMENT

67.     To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc.  The provider agreement

requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

### i.   Medical Necessity and Appropriateness Requirements

68.     One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information. 42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

69.     Various claims forms, including but not limited to the Hospital Cost Report and the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations.   42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406.   Providers must also certify that the information submitted is correct and supported by documentation and treatment records.  Id. See also, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

70.     The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

### ii.   Obligation To Refund Overpayments

71.     As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports).  42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. See also 42 C.F.R. §§ 489.40, 489.31. In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and

the failure to do so is a felony. Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments. 42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

72.     Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS.   42 U.S.C. § 1395u(l)(3).  In such cases, the overpayment is subject to recoupment. 42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments. 42 U.S.C. § 1395*l*(j).

### iii.   Peer Review and Quality Assessment Obligations

73.     Another important requirement for a hospital that wishes to participate in the Medicare Program is that the hospital "must have an organized medical staff that operates under bylaws approved by the governing body and is responsible for the quality of medical care provided to patients by the hospital." 42 C.F.R. § 482.22.Hospitals must "develop, implement, and maintain an effective, ongoing, hospital-wide, data-driven quality assessment and performance improvement ['QAPI'] program." 42 C.F.R. § 482.21.

74.     As part of its QAPI program, a hospital "must set priorities for its performance improvement activities that (i) focus on high-risk, high-volume, or problem-prone areas; (ii) consider the incidence, prevalence, and severity of problems in those areas; and (iii) affect health outcomes, patient safety, and quality of care." Id. § 482.21(c)(1).

75.     Finally, a hospital "must track medical errors and adverse patient events, analyze their causes, and implement preventive actions and mechanisms[.]" Id. § 482.21(c)(2).

## VII.    OTHER FEDERALLY-FUNDED HEALTH CARE PROGRAMS

76.     Although false claims to Medicare are the primary FCA violations at issue in this case, the patients who were subjected to the medically unnecessary procedures that are the subject of this action were beneficiaries of one of three federally-funded health care benefit

programs – Medicare, Medicaid, or TRICARE/CHAMPUS.  Accordingly, those other two programs are briefly discussed as well.

77.     The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals.  CMS administers Medicaid on the federal level with various State counterparts.  Reimbursement of hospital costs or charges is governed by Part A of Medicare, through the hospital cost report system, and reimbursement of physician charges is governed by Part B of Medicare. As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

78.     The Agency for Health Care Administration is the Florida agency/administrator which handles the reimbursement for Medicaid Claims.

## VIII.  TRICARE, formerly known as CHAMPUS

79.     A federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, *et seq.*). Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i). And, like the Medicare Program and the Medicaid Program, TRICARE prohibits

practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).

## IX.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Presentation of False Claims pursuant to 31 U.S.C. § 3729(a)(1)(A)**

80.   Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 79 of this Complaint as if fully set forth herein.

81.   As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendant has knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

### SECOND CAUSE OF ACTION

**Making or Using False Record or Statement to Cause Claim to be Paid pursuant to 31 U.S.C. § 3729(a)(1)(B)**

82.   Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 79 of this Complaint as if fully set forth herein.

83.   As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendants – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

### THIRD CAUSE OF ACTION

**Making or Using False Record Statement to Avoid an Obligation to Refund Pursuant to 31 U.S.C. § 3729(a)(1)(G)**

84.   Relator repeats and incorporates by reference the allegations contained in

Paragraphs 1 through 79 of this Complaint as if fully set forth herein.

85.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendant – material to an obligation to pay or transmit money to the Government to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the Government.

### FOURTH CAUSE OF ACTION

**Conspiracy pursuant to 31 U.S.C. § 3729(a)(1)(C).**

86.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 79 of this Complaint as if fully set forth herein.  As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants conspired to make or present false or fraudulent claims and performed one of more acts to effect payment of false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(C).

### FIFTH CAUSE OF ACTION

**Presentation of False Claims pursuant to §68.082(a) Fla. Stat.**

87.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 79 of this Complaint as if fully set forth herein.

88.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of §68.082 (2)(a) Fla. Stat.

### SIXTH CAUSE OF ACTION

**Making or Using False Record Statement to Cause Claim to be Paid pursuant to §68.082 (2)(b) Fla. Stat.**

89.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 79 of this Complaint as if fully set forth herein.

90.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendants – material to false or fraudulent claims in violation of §68.082 (2)(b) Fla. Stat.

## SEVENTH CAUSE OF ACTION

**Making or Using False Record Statement to Avoid an Obligation to Refund Pursuant to §68.082 (2)(g) Fla. Stat.**

91.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 79 of this Complaint as if fully set forth herein.

92.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay to the Government.

## EIGHTH CAUSE OF ACTION

**Conspiracy to submit a false or fraudulent claim pursuant to §68.082(c)**

93.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 79 of this Complaint as if fully set forth herein. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants conspired to make or present false or fraudulent claims and performed one of more acts to effect payment of false or fraudulent claims.

## X.    <u>DEMAND FOR RELIEF</u>

**WHEREFORE**, Relator, on behalf of the United States Government and the State of Florida, demand judgment against the Defendants, ordering that:

**As to the Federal Claims:**

    a.  Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' action, plus a civil penalty of not less than $5,000 and not more than $10,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*;

    b.  Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(d) of the False Claims Act and/or any other applicable provision of law;

    c.  Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law; and

    d.  Relator be awarded such other and further relief as the Court may deem to be just and proper.

**As to the State Claims:**

    a.  Pursuant to §68.082(2)(g), Defendants pay an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' action, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of the Florida False Claims Act;

    b.  Relator be awarded the maximum amount allowed pursuant §68.085 of the Florida False Claims Act and/or any other applicable provision of law;

    c.  Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by §68.086 and any other applicable provision of the law; and

    d.  Relator be awarded such other and further relief as the Court may deem to be just and proper.

## TRIAL BY JURY

Relator hereby demands a trial by jury as to all issues.

Dated this _____ day of February, 2013.

Respectfully submitted,

John A. Yanchunis
Florida Bar No. 324681
jyanchunis@forthepeople.com
MORGAN & MORGAN, P.A.
201 One Tampa City Center, 7th Fl.
Tampa, Florida 33602
(813) 223-5505 (Telephone)
(813) 275-9295 (Facsimile)