# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA and )
STATE OF FLORIDA )
*ex rel.* DAVID WILLIAMS, D.O., )
                 )
        Plaintiff/Relator, )
                 )  CASE NO.: 6:16-cv-00578-CEM-DAB
v. )
                 )  Honorable Carlos E. Mendoza
HCA HOLDINGS, INC., )
                 )
        Defendant. )
                 )
                 )
                 )
                 )
                 )

## SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3730) AND THE FLORIDA FALSE CLAIMS ACT (FLA. STAT. § 68.083)

On behalf of the United States of America and the State of Florida, Plaintiff and Relator, David Williams, D.O. ("Dr. Williams" or "Relator") files this Amended *qui tam* complaint against Defendant HCA Holdings, Inc. ("HCA" or "Defendant") and alleges as follows:

## I.    INTRODUCTION

    1.    This is an action to recover treble damages and civil penalties on behalf of the United States of America and the State of Florida in connection with the systematic overbilling of tests and procedures performed on patients seeking emergency care, in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.* (collectively referred to as the "FCAs").

    2.    Pursuant to the FCAs, Relator seeks to recover, on behalf of the United States of America and the State of Florida, damages and civil penalties arising from false or

fraudulent claims that HCA submitted or caused to be submitted to government funded health insurance programs.

3.     For many years, HCA has engaged in a scheme to bill for unnecessary medical tests and procedures performed on patients seeking emergency care in HCA's hospitals. These unnecessary tests and procedures cost government healthcare programs many millions of dollars.  Worse, the unnecessary tests and procedures subject vulnerable patients to unnecessary risk of complications and expose them to dangerous and unnecessary radiation.

4.     HCA has instituted a system at its emergency departments designed to maximize the number of tests performed on patients seeking emergency care.  Specifically, patients presenting to an HCA emergency department are met by a "greeter," a mid-level health care provider who asks the patient for their "chief complaint"—the symptom that brought them to the emergency room.  The greeter then enters that chief complaint into the software program—called Meditech—that HCA uses in all of its emergency departments.  The Meditech system then presents the greeter with a set of tests which are "recommended" by the system based on nothing other than the chief complaint.

5.     The greeter, who typically has little experience with emergency medicine, then orders the panel of tests for the patient based on the recommendations from Meditech.  The patients are thus exposed to a battery of testing before any physical examination, before any medical history or any further explanation of the chief complaint is given, and before the patient is seen by a physician.

6.     Many of these tests are expensive, invasive, and dangerous, and should never be ordered before a physician examines the patient.  For example, as Relator observed, a child presenting with symptoms as benign as a sore throat will be subjected to a CT scan with

2

intravenous contrast.  The ionizing radiation from the CT scan is harmful to all patients—but is particularly dangerous for children—and the intravenous contrast can harm the patient's kidneys. All this occurs when a proper medical examination would have revealed that the child simply had strep throat.  HCA charges government healthcare programs approximately $1,000 for every unnecessary and dangerous CT scan it runs.

7.    Similarly, patients presenting with all manner of relatively benign symptoms are subject to the variety of tests associated with a "sepsis panel,"  designed to identify cases of sepsis—a rarely-occurring system-wide blood infection.  For example, Dr. Williams treated a 75 year-old patient who presented to the greeter with "shortness of breath" and claimed to have been stung by a bee the day before.  Three minutes after the patient reported the patient's symptoms to the greeter, HCA ordered a panel of tests associated with liver problems and sepsis, despite the fact that nothing about the patient's symptoms suggested emergent liver failure or a system-wide emergent blood infection.  When Dr. Williams saw the patient, he quickly and easily diagnosed and discharged the patient with mild anxiety resulting from the bee sting.  Dr. Williams tried to cancel the battery of entirely unnecessary tests, but was too late.

8.    Despite the fact that it is the mid-level provider (typically a physician assistant ("PA") or nurse practitioner) who orders the battery of tests on patients presenting to HCA emergency departments, HCA requires physicians working in its emergency departments to sign off on the tests as though it was the physician who ordered and approved the testing.  In fact, the physicians at HCA emergency departments typically never see the patient before the tests are ordered, but they are nonetheless required to sign-off on the tests as though they ordered them.  Indeed, physicians were often required to sign off on tests that they did not order—and entire patient charts—for patients that they never even treated.  Physicians who refused, or even

complained about having to sign off on those tests and charts were reprimanded, or "taken off the schedule" (essentially fired) for their refusal, because HCA would not bill for the tests without physician signatures.

9.      Dr. Williams, and many others, complained vociferously about the unnecessary testing and compulsory physician signatures at HCA's facilities.   But HCA continued with its scheme, and continued to bill for tests knowing that the physicians staffing its own emergency departments believed that the tests HCA ordered were unnecessary.

10.     Claims for unnecessary services, like the unnecessary tests for which HCA routinely seeks payment, are false claims.   HCA's false claims cause government health care programs to overpay many millions of dollars every year, adversely impact patient care, and result in liability under the FCAs.   If left unchecked, HCA will continue to submit false claims for reimbursement for improperly ordered tests, causing the already-strained government health care programs to overpay HCA, and continue to adversely impact patient care.

## II.   PARTIES

### A.      The Relator

11.     Under the FCAs, a person with knowledge of false or fraudulent claims against the Government (a "Relator") may bring an action on behalf of the federal and state governments and himself.

12.     Relator, David T. Williams, D.O., FACEP, FAAEM, is a citizen and resident of Merritt Island, Florida. Dr. Williams is Board Certified in Emergency Medicine and licensed to practice in Florida, Pennsylvania, Montana, West Virginia, and Kentucky. Dr. Williams earned his undergraduate degree from the California University of Pennsylvania in 1987. He attended and completed his medical education at Philadelphia College of Osteopathic

Medicine in Philadelphia, Pennsylvania in 1991. Subsequently, Dr. Williams attended the Naval Aerospace and Operational Medical Institute, graduating in February 1993.

13.     Dr. Williams served as a United States Naval Flight Surgeon from 1993 to 2003.  Dr. Williams developed and affected a medevac plan for over 10,000 members of the U.S. military in Operation Cobra Gold.  After serving his country through the military, Dr. Williams completed his residency at the University of Florida. Dr. Williams completed a course at Kennedy Space Center where he became certified by NASA in Space Shuttle Medical Support. Through his work with NASA, Dr. Williams directed medical clinic operations during the Mir Shuttle Phase I Program, developing a medical support plan of Western medical care for the NASA personnel in Russia.  Dr. Williams trained both astronauts and cosmonauts to use medical equipment and perform procedures while aboard the Mir Station.

14.     Dr. Williams was the Chairman of Emergency Medicine form 2000 to 2009 at Wuesthoff Health System where he also served as the Medical Director for Wuesthoff Emergency Physicians. He helped develop and individualize the first Meditech Emergency Department Computerized Physician Order Entry system.

15.     Today, Dr. Williams serves as the President and Chief Medical Officer of MedFast Urgent Care Centers, managing staff and providing consulting and management services to design and implement urgent care centers.

16.     Dr. Williams uncovered the fraudulent activity while working at the HCA West Florida Emergency room as soon as he began his employment.

17.     None of the allegations set forth in this Disclosure Statement or in the Complaint to be filed are based on a public disclosure of information in a criminal, civil, or administrative hearing; in a Congressional, administrative, or General Accounting Office report,

hearing, audit, or investigation; or from news media. Rather, they are the independent declaration of Dr. Williams.

18.    Dr. Williams is an original source of information within the meaning of the False Claims Act, 31 U.S.C. §3730(e)(4)(B).

**B.    Defendant**

19.    Defendant HCA is a publically traded Delaware corporation, headquartered in Tennessee, that employs more than 199,000 employees in over 160 hospitals and 110 free standing surgery centers in 20 states.

20.    HCA utilizes emergency department physician groups to staff its emergency rooms across the country, including Apollo MD, EmCare and TeamHealth, Jacksonville Emergency Consultants, P.A. d/b/a Titan Emergency Group ("Titan") and Sheridan Healthcare, Inc. ("Sheridan").

21.    HCA owns, operates, and controls the activities of its hospitals. HCA is directly involved in setting and enforcing hospital guidelines and is actively involved in the billing practices of these hospitals. In HCA's Annual Report for 2013, filed with the Securities and Exchange Commission, HCA explains that as of "December 31, 2013, [it] operated 165 hospitals, comprised of 159 general, acute care hospitals; five psychiatric hospitals; and one rehabilitation hospital."

22.    HCA's touts the control it exerts over the practices at its hospitals, and it has imposed a "Code of Conduct" that is applicable to all its directors, officers, and employees. HCA's Code of Conduct specifies that it "provides guidance to ***all HCA colleagues*** and assists us in carrying out our daily activities within appropriate ethical and legal standards. These obligations apply to our relationships with patients, affiliated physicians, third-party payers,

subcontractors, independent contractors, vendors, consultants, and one another."  HCA Code of

Conduct at 3 (emphasis added).

> 23.    HCA's West Florida Hospital, where Dr. Williams worked, contracted

with Sheridan for two years and then contracted with Titan to staff its emergency department

with physicians.  Sheridan and Titan use recruiting agencies to locate board certified physicians

and other healthcare professionals, paying a recruiter who in turn pays the physicians and other

healthcare professionals. Sheridan and Titan then submit the physicians' bills for services

rendered at an emergency room or hospital for payment.

## III.    THE FALSE CLAIMS ACTS

> 24.    The Federal FCA, as amended, imposes liability on any person who:
>
> (A) knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false
> record or statement material to a false or fraudulent claim; . . . or
>
> (G) knowingly makes, uses, or causes to be made or used, a false
> record or statement material to an obligation to pay or transmit
> money or property to the Government, or knowingly conceals or
> knowingly and improperly avoids or decreases an obligation to pay
> or transmit money or property to the Government . . . .

31 U.S.C. § 3729(a)(1).  A person liable under the FCA "is liable to the United States

Government for a civil penalty of not less than $5,500 and not more than $11,000 . . . plus 3

times the amount of damages which the Government sustains because of the act of that person."

*Id.*

> 25.    The terms "knowing" and "knowingly" in the FCA mean that a person

must (1) have actual knowledge of the information and (2) act in deliberate ignorance of the truth

or falsity of the information; or (3) act in reckless disregard of the truth or falsity of the

information. 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

      26.    The Florida FCA, as amended, imposes liability on any person who:

> (a) Knowingly presents or causes to be presented to an officer, or employee of an agency a false or fraudulent claim for payment or approval;
>
> (b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency; or . . .
>
> (g) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to an agency . . . .

Fla. Stat. § 68.082(2). Any person liable under the Florida FCA "is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person." *Id.*

      27.    Like the Federal FCA, the terms "knowing" and "knowingly" in the Florida FCA provision "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required. Innocent mistake is not a defense to an action under this act." Fla. Stat. § 68.082.

## IV.    GOVERNMENT HEALTHCARE PROGRAMS

      28.    HCA routinely and systematically overbills government healthcare programs, including Medicare, Medicaid, and TRICARE, for unnecessary and up-coded medical procedures.

A.    **Medicare**

29.    In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426-1.  Generally, those over 65 years of age, or under 65 with a permanent disability, are eligible for Medicare.

30.    Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

31.    CMS   contracts   with   private   companies,   referred   to   as   "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 413.64. Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

32.    There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them. 42 U.S.C. §§ 1395j-1395w-5.

33.    Under Medicare Part A, hospitals enter into an agreement with Medicare to provide health care items and services to treat Medicare patients. The hospital, also called a

9

"provider," is authorized to bill Medicare for that treatment. HCA derives a significant portion of their revenue from the Medicare Program.[1]

34.     In order to get paid, a hospital completes and submits a claim for payment on a designated claim form, which, during the relevant time period, was or has been designated either as a Form UB-4 (also known as a CMS-1450) or a Form UB-92. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the UB-4/UB-92 to determine whether and what amounts the hospital is owed.

35.     In addition, at the end of each fiscal year, CMS requires hospitals to submit a Form 2552, more commonly known as the Hospital Cost Report, to the fiscal intermediary. The Hospital Cost Report contains information on facility characteristics, utilization data, costs, Medicare settlement data, financial statement data, and cost and charges by cost center. 42 C.F.R. 413.20(b), 42 U.S.C. § 1395g.

36.     While Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-4s/UB-92s) during the course of the fiscal year, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider and is reported on the annual Hospital Cost Report. This total determines Medicare's liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due to either the Medicare Program or the provider.

---

[1] In 2012, for example, HCA reported that approximately 45% of its revenue nationwide was from Medicare or Medicaid.  HCA 2012 Annual Report at 5.

37.     Medicare relies on the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than the provider has already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60, 413.64(O)(1).

38.     A key purpose of the Hospital Cost Reports is to protect the federal government from loss due to mistake or fraud. Medicare has the right to audit Hospital Cost Reports and financial representations made by program participants to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. However, while Hospital Cost Reports are potentially subject to audit review, it is generally known throughout the health care industry that fiscal intermediaries do not have sufficient resources to perform in-depth audits on the majority of Hospital Cost Reports submitted to them. It is also generally known throughout the health care industry that two to three years will elapse from the time Hospital Cost Reports are filed until they are finalized. For these reasons, the cost reporting system relies substantially on the good faith of providers to prepare and file accurate Hospital Cost Reports.

39.     To this end, the Hospital Cost Report, Form 2552, contains the following warning:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

40.     That advisory is then followed by the following "Certification," which must be signed by the chief administrator of the provider or a responsible designee of the administrator:

CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

41.     In order to get paid from Medicare, providers, like HCA, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated CMS 1500. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS 1500 to determine whether and what amounts the provider is owed.

42.     To this end, the Health Insurance Claim Form, CMS 1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

That certification is then followed by the following "Notice:"

12

Anyone who misrepresents or falsifies essential information to
receive payment from Federal funds requested by this form may
upon conviction be subject to fine and imprisonment under
applicable Federal laws.

### (i)    Obligation To Refund Overpayments

43.    As a condition to participate in the Medicare Program, providers are
affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they
become aware in their claims for Medicare reimbursement (including in their cost reports). 42
C.F.12 §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C; *see also* 42 C.F.R.
§§ 489.40, 489.31. In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-
created duty to disclose any known overpayments or billing errors to the Medicare carrier, and
the failure to do so is a felony. Providers' contracts with CMS carriers or fiscal intermediaries
also require providers to refund overpayments. 42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

44.    Accordingly, if CMS pays a claim for medical goods or services that were
not medically necessary, a refund is due and a debt is created in favor of CMS. 42 U.S.C.
§ 1395u(1)(3). In such cases, the overpayment is subject to recoupment. 42 U.S.C. § 1395gg.
CMS is entitled to collect interest on overpayments. 42 U.S.C. § 13951(j).

### (ii)    Peer Review and Quality Assessment Obligations

45.    Another important requirement for a hospital that wishes to participate in
the Medicare Program is that the hospital "must have an organized medical staff that operates
under bylaws approved by the governing body and is responsible for the quality of medical care
provided to patients by the hospital." 42 C.F.R. § 482.22. Hospitals must "develop, implement,
and maintain an effective, ongoing, hospital-wide, data-driven quality assessment and
Performance improvement program." 42 C.F.R. § 482.21.

46.     As part of its QAPI program, a hospital "must set priorities for its performance improvement activities that (i) focus on high-risk, high-volume, or problem-prone areas; (ii) consider the incidence, prevalence, and severity of problems in those areas; and (iii) affect health outcomes, patient safety, and quality of care." *Id.* § 482.21(c)(1).

47.     Finally, a hospital "must track medical errors and adverse patient events, analyze their causes, and implement preventive actions and mechanisms[.]" *Id.* § 482.21(c)(2).

**B.     Medicaid**

48.     The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals. CMS administers Medicaid on the federal level with various State counterparts. As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

49.     The Agency for Health Care Administration is the Florida agency/administrator which handles reimbursement for Medicaid Claims.

**C.     TRICARE**

50.     TRICARE is a federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, *et seq.*).

14

**D.      Government Healthcare Programs Do Not Pay for Unnecessary Or Up-coded Services**

51.     Submitting a claim for payment to government healthcare programs for unnecessary or up-coded medical services is a quintessential FCA violation.

52.     To participate in the Medicare Program, a health care provider must file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The provider agreement requires compliance with certain requirements that the Secretary deems necessary for receiving reimbursement from Medicare. One such important requirement is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information.  42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.29.

53.     Various claims forms, including but not limited to the Hospital Cost Report and the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations. 42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406. Providers must also certify that the information submitted is correct and supported by documentation and treatment records.  Id.  See also, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

54.     Similarly, Florida Medicaid only covers "medically necessary services." Fla. Prescribed Drug Services Coverage, Limitations and Reimbursement Handbook, Introduction.  When presenting a claim for payment under the Florida Medicaid program, "a provider has an affirmative duty to . . . present a claim that is true and accurate and that is for goods and services that . . . are medically necessary . . . ." *Id.* § 5-4.

55.     Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.P.R. § 199.4(a)(1)(i). And, like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).

56.     Submitting claims for unnecessary medical services that do not disclose that such services are unnecessary violates these statutory and regulatory requirements and is fraudulently misleading, causing the government to pay for claims that it would not otherwise pay for.

57.     Claims for up-coded medical services are claims for payment that are artificially inflated. Submitting up-coded claims for payment causes the government to pay for claims that it would not otherwise pay.

**E.     HCA's Hospitals Treat a Significant Number of Patients Covered By Medicare, Medicaid, and/or TRICARE.**

58.     A significant number of patients covered by Medicare, Medicaid, and/or TRICARE are treated at HCA's hospitals.  HCA reports the percentage of revenue received from Medicare and Medicaid each year.  In 2012, for example, HCA reported that approximately 45% of its revenue nationwide was from Medicare or Medicaid.[2]  In Florida, much of the patient population served by HCA's hospitals is covered by a government healthcare provider. For example, there are over 4 million Medicare beneficiaries in Florida—meaning that one in five

---

[2] HCA 2012 Annual Report at 5.

Florida residents have Medicare coverage.[3]   Another 3.5 million Florida residents are covered by Medicaid.[4]   HCA reports that all of its hospitals are eligible to participate in Medicare and Medicaid programs.[5]   And HCA's annual report states, "We receive payments for patient services from the federal government under the Medicare program, state governments under their respective Medicaid or similar programs, [and] managed care plans."[6]   Florida also has a significant military presence.   For example, HCA's West Florida Hospital is located in Pensacola, FL, less than 25 miles from both Pensacola Naval Air Station and Whiting Naval Air Station.   Thus hospitals located in Florida, including West Florida Hospital, have a high percentage of patients with medical insurance provided through Medicare, Medicaid, or TRICARE.

59.     When HCA provides services to a patient, HCA submits a claim for payment to the patient's insurance provider, including Medicare, Medicaid, or TRICARE.   HCA submitted claims for tests and procedures to these programs—including claims for unnecessary tests and procedures resulting from the greeter system.

## V.     HCA'S CONDUCT

### A.     HCA's Fraudulent Greeter System and Standard Order Sets

60.     When a patient arrives in the lobby of an HCA hospital emergency room they are met by a mid-level healthcare provider known as a greeter.[7] Most, if not all, greeters are PAs or nurse practitioners who are supposed to work under the supervision of a licensed medical

---

[3] https://www.medicareresources.org/florida/ ("One in five Florida residents have Medicare coverage."), last accessed July 14, 2016; http://kff.org/medicare/state-indicator/total-medicare-beneficiaries/# (indicating 4,024,223 total Medicare beneficiaries), last accessed July 14, 2016.
[4] https://www.healthinsurance.org/florida-medicaid/ (indicating that 3,496,934 people in Florida are covered by Medicaid), last accessed July 15, 2016.
[5] HCA 2012 Annual Report, at 6 ("All of our general, acute care hospitals located in the United States are eligible to participate in Medicare and Medicaid programs.").
[6] HCA 2012 Annual Report, at 5.
[7] In some HCA hospitals the greeter is also known as the "provider in triage" or "PIT."

doctor. Typical duties of a PA or nurse practitioner include taking medical histories, conducting physical exams and following up with patients as they move through the hospital or emergency room.

61.     At HCA, after vital signs[8] are taken, the greeter inputs a patient's chief complaint into a computer system called Meditech.  This occurs before the patient is given a bed, before a medical history is taken, and before a physical examination is performed.  Based upon the complaint entered by the greeter, HCA's Meditech system dictates which tests and procedures the greeter should order by automatically populating a standard set of orders.  The greeter than proceeds to place the orders without an appropriate medical evaluation and without physician approval.  In fact, physicians typically do not see patients until 30-90 minutes later. By that time, the tests and procedures have already been performed and/or it is too late to cancel the unnecessary orders.   Dr. Williams attempted to cancel unnecessary tests on multiple occasions, but on each occasion the hospital system overrode his cancellation.

62.     HCA's Meditech system tracks the patients' throughput and greeter times. Within Meditech, there is a nursing profile called "dashboard data" that contains nursing triage notes. Nurses and secretaries are trained to alter the time at which patients are placed in a bed so that this time is the same or before the "greet" time.  Below is a screenshot of the dashboard data view of the Meditech system with Dr. Williams' annotations:

---

[8] Typically, "vital signs" mean temperature, pulse rate, rate of breathing, and blood pressure.



The "Placed in Bed Time" in the screen above will be changed to match—or come before—the "MD/DO/PA/MP Initiates Contact/Greets Patient Time."

   63. This is done because after a test is done on a patient, the patient is then placed back in the waiting room. The patient may not actually be given a bed for several more hours. By doing this, the record reflects that the patient was placed in an emergency room bed and evaluated *before* tests were ordered, when, in fact, the patient was still in the waiting room, having not yet seen a physician. The electronic T-System contains the correct time the provider takes a history and performs a physical examination of the patient.  Thus, HCA routinely back-dated or back-time-stamped doctor-patient times into the Meditech system. In doing so, HCA is able to make its "door to doc" times look better and also make it appear that certain patients were treated as having true, urgent emergencies, thereby justifying additional tests and procedures.

64.     HCA creates standard order sets, sometimes also referred to as "protocols," "standing orders," or "routine orders." These order sets are "suggested" tests and procedures to perform on a patient based upon his or her chief complaint.  HCA creates these standard order sets and inputs them into the Meditech computer system used by the greeters. When the greeter inputs a patient's complaint, HCA's standard orders automatically populate in the Meditech system.  A specific complaint could trigger 20-40 different tests. Greeters routinely order all, or nearly all, of the standard order sets populated by Meditech.

65.     HCA's physician orientation guide document acknowledges that its greeters order HCA's "standard order set" based upon a patient's chief complaint and admonishes physicians not to criticize the greeters for ordering all these tests: "To help reduce the pt time in the ED, the PA will place orders  using an [*sic*] standing orders set.  Important!!  Please do not criticize the MLP's [midlevel practitioner] when they place orders you do not agree with."  Ex. 1, at 7.  Often, the orders placed by the greeters are medically unnecessary and would never have been ordered had the patient been appropriately evaluated with a physical examination and medical history.

66.     Thus, unnecessary, costly and potentially harmful tests are being administered to patients. Based on the protocols set up by the HCA and the use of the greeter to maximize these protocols and billable opportunities, multiple tests that would not have been ordered by the physician are now carried out before the physician sees the patient. The costs associated with this activity are substantial. Government insurers (Medicare, Medicaid, and Tricare) all have a contractual obligation to enrollees and require reasonable documentation that services are consistent with the insurance coverage provided. At its most basic element, the medical necessity and appropriateness of the diagnostic services provided must be apparent and

the services must be reported accurately. Both of these basic concepts were being manipulated by HCA.

67.     The cost for unnecessary testing is significant.  HCA's protocols routinely call for unnecessary care and drastic measures, including CAT scans (computerized axial tomography), also known as CT scans, and sepsis panels.  CT scans were ordered by greeters using the Meditech protocols. A CT scan can cost approximately $1,000. Based on the protocols created and encouraged by HCA, the greeters would orders CT scans for the head, neck and chest of a patient ($1,000 each) without taking a medical history or consulting with a physician. If a patient complaint matched the protocols for having sepsis (a potentially life threatening infection) the full sepsis protocol could cost more than $10,000.

68.     Throughout Dr. Williams' employment, he consistently questioned the high number of unnecessary tests that were ordered by the greeters under this system.  He was advised by other physicians to go along with the system if he wanted to keep his job.

**B.     HCA's Scheme Causes Greeters to Falsely Order Tests Under Physicians' Names and Forces Physicians To Retroactively Approve The Orders**

69.     When HCA's greeters place an order, they do so under a physician's name, without the physician's knowledge.  In fact, under HCA's system, the physician is often unable to see the patient before the tests are performed.   And even where a physician is able to see a patient before the tests are performed, HCA's Meditech system frequently does not permit the physician to cancel the greeter's orders.  Regardless of whether the physician believes the tests were medically necessary or appropriate, he or she is later forced by HCA to electronically sign for the test retroactively.  In fact, HCA sometimes forces its physicians to sign for procedures performed on patients that the physician *never* saw.  For example, Dr. Williams was compelled to sign for tests ordered by a greeter for a patient that saw a different physician working in the

21

ED during Dr. Williams' shift.  Failure to sign retroactively for the already-performed tests means a physician can face possible suspension or termination.  Not only were physicians forced to retroactively sign for tests they did not order, physicians were forced to sign off on entire patients charts without ever having seen the patient.

70.     Dr. Williams explained to Registered Nurse Natalie Seaber that the electronic files he was told to sign contained orders for tests ordered by mid-levels and nurses on patients that Dr. Williams never performed a history or physical examination on, or even treated. RN Seaber responded in an email to Dr. Williams:

> Dr. Williams,
>
> It appears the mid-level in triage and other mid-levels ordered orders for the patients you assumed care for or oversaw the care by the mid-levels. The responsibility for mid-level orders or any nursing protocols falls to the ED physician. Any further questions Dr. Aleman may be able to assist.
>
> Natalie Seaber, RN, BS, CNML
>
> Director of Emergency Services
>
> West Florida Hospital

71.     HCA compelled physicians to sign orders for unnecessary testing or they would have payment withheld, be suspended, and/or effectively terminated for noncompliance.

72.     Dr. Williams and other emergency room physicians frequently received emails concerning delinquent patient charts that required their signatures. HCA hospitals contract with third parties such as Titan (Dr. Williams' employer) to provide physicians for hospitals and emergency departments. A large number of physicians have worked at HCA hospitals, including at least 94 physicians that worked at West Florida Hospital during a two year period. Many Physicians left after being forced to sign for tests and procedures that they did not order. In September 2012, Dr. Vernon Sichewski was asked to sign off on mid-level orders and medical

records. He refused based on not having ordered the tests. As a result, Dr. Williams was told that

Dr. Sichewski was released by the hospital from further schedules.

      73.    In November 2012, Dr. Williams received an email from Greg Makos of

West Florida Hospital that contained an email from Valerie Santos of HCA concerning an

increase in delinquency rates for physicians from Titan. Ex. 2 at 2-4. Ms. Santos included a

table with information about the number of charts she wanted each physician to sign:

| PHYSICIAN NAME | <30 | +30 | +60 | +90 | +120 | TOTAL |
|---|---|---|---|---|---|---|
| Williams,David Thomas | 48 | 168 | 1 | 0 | 0 | 217 |
| Sichewski,Vernon R | 1 | 66 | 2 | 0 | 0 | 69 |
| Taladriz,Arturo | 1 | 60 | 0 | 0 | 0 | 61 |
| Whyte,Kirk R | 0 | 33 | 0 | 0 | 0 | 33 |
| Tyulmenkov,Valentyn | 0 | 30 | 0 | 0 | 0 | 30 |
| Zaman,Hasanuz | 9 | 29 | 0 | 0 | 0 | 38 |
| Shams Esshaghi,Kiumars | 70 | 17 | 0 | 0 | 0 | 87 |
| Manginani,Sridevi | 14 | 14 | 0 | 0 | 0 | 28 |
| Quiray,Lourdes Ferrer | 1 | 6 | 0 | 0 | 0 | 7 |
| Fitzgerald,Mekeshia S | 47 | 4 | 2 | 3 | 2 | 58 |
| Walker,Sandra L | 5 | 4 | 2 | 0 | 0 | 11 |
| Smith,Bryan J | 0 | 2 | 7 | 56 | 1 | 66 |
| Araya,Christina M | 31 | 2 | 0 | 0 | 0 | 33 |
| Brady,Craig A | 8 | 1 | 0 | 0 | 0 | 9 |
| Castro,Paul T | 0 | 1 | 0 | 0 | 0 | 1 |
| De La Paz,Yira Larissa | 19 | 1 | 0 | 0 | 0 | 20 |
| Dujour,Roxanne | 11 | 1 | 0 | 1 | 0 | 13 |
| Mayotte,Peter T | 0 | 1 | 98 | 0 | 0 | 99 |
| Muth,Diane M | 12 | 1 | 0 | 0 | 0 | 13 |
| Rao,Rammohan S | 1 | 1 | 3 | 0 | 0 | 5 |
| Saint Fleur,Hurline | 42 | 1 | 0 | 0 | 0 | 43 |
| Schreiber,Michael L | 0 | 1 | 0 | 0 | 0 | 1 |
| Stanley,Katherine K | 0 | 1 | 0 | 0 | 0 | 1 |
| Defour,Fulton G | 2 | 0 | 0 | 1 | 8 | 11 |
| Katharani,Padmani K | 0 | 0 | 0 | 0 | 6 | 6 |
| Baker,Gregory J | 1 | 0 | 0 | 1 | 1 | 3 |
| Buzas,Peter L | 78 | 0 | 0 | 0 | 1 | 79 |
| Snyderman,Jonathan L. | 0 | 0 | 0 | 5 | 1 | 6 |
| Braumiller,Brian M | 0 | 0 | 0 | 1 | 0 | 1 |

*Id.* at 4. Mr. Makos requested that Dr. Williams review the chart that was contained in the email

and urged the recipients of the email to sign the appropriate charts. *Id*. at 3.

      74.    Dr. Williams replied to Mr. Makos:

> "It appears that there are 1700 tests ordered in Meditech or HPF
> under my name for 217 patients, many of which I did not
> personally take care of. It appears these are tests and treatments
> that were ordered by the hospital staff and mid-level providers in

> triage.  I have gone ahead and co-signed these in Meditech but in the future I would like to limit my signatures to patients I actually took care of.  Please let me know if there is anything else you need."

Ex. 2 at 2.

75.     Dr. Williams' complaint was forwarded on to Jeff Chandler.  Ex. 2 at 2.

Mr. Chandler's reply made clear that having greeters order tests under "*any*" physician's name—

and later forcing a physician to sign off on the tests—was HCA's standard "*process*:"

> "Currently the processes is that while in Triage the midlevels initiate orders under any of the physicians that are working at that time. That has always been the process. I don't think there are any exceptions. So, just by virtue of being a physician working that day, triage orders may be placed by the midlevel in triage under their name."

*Id.*

76.     Dr. Williams received another email from Mr. Makos in September 2012

that contains another table of patient charts from Valerie Santos on which HCA wanted

physicians to sign off.  Ex. 4 at 2-11.  Mr. Gyarmathy replied to this email to further urge Dr.

Williams and other physicians to sign off on patient charts.  *Id.* at 1.  Ms. Santos' email indicates

that the charts and tests for which HCA was demanding retroactive signatures were associated

with $536,829 of revenue for HCA.  *Id.* at 3.

77.     Titan President Raymond Gyarmathy, MD, FAAEM also encouraged the

physicians to finalize the charts. Gyarmathy indicated he would hold up payment to the

physicians if the charts were not finished.

78.     Similarly, in December 2012, Stephanie East of HCA sent an email to Dr. Williams and other physicians regarding unsigned charts.   Ms. East's email confirms that physicians had been suspended because they had not complied with HCA's demands to sign charts:

**From:** Stephanie.East@hcahealthcare.com
**Sent:** Friday, December 28, 2012 9:29 AM
**To:** Jaime.Aleman@hcahealthcare.com ; adandgarrett@yahoo.com ; docdrew73@cox.net ; conti109@yahoo.com ; brycetiller@hotmail.com ; bbruniousmd@mchsi.com ; Castellon@me.com ; gleesonc2@hotmail.com ; erdoc2@me.com ; 7brady@msn.com ; eyelandgirl11@yahoo.com ; David.Williams@cfl.rr.com ; dmuthmd@aol.com ; spojeny@gmail.com ; hekintz@yahoo.com ; hollywilsonmd@yahoo.com ; j.aleman@titandoctors.com ; krabbedl@yahoo.com ; tampaerdoc@gmail.com ; jbchandler@cox.net ; jnieto9639@aol.com ; jmeade@statdoc.com ; takdoves@bellsouth.net ; wescam01@aol.com ; pa@HTHMissions.com ; lilly.fotiadis@gmail.com ; mpschremmer@yahoo.com ; dr.goodwin@live.com ; pacrawford87@gmail.com ; pjobrien@me.com ; pallenmd@aim.com ; pikumar@aol.com ; r.gyarmathy@titandoctors.com ; ferozathompson@gmail.com ; wsmiller@gmail.com
**Cc:** Paul.Hermance@hcahealthcare.com ; James.Lambert@hcahealthcare.com ; Stephanie.East@hcahealthcare.com ; bheini@ermedmgmt.com ; Michele.Hawkins@hcahealthcare.com ; J.Congo@titandoctors.com ; kbuller@ermedmgmt.com ; Gregory.Makos@hcahealthcare.com
**Subject:** TOO HIGH
Good morning everyone,
I hope everyone's week has gone well so far. I am giving an end of the week update on numbers. In less than a week we jumped from 81 incomplete in t-system to 199…This is entirely too many incomplete. Below is the list of providers and their incomplete number.

1.   Please let Greg know when you are caught up that way he can let Corp and the Hosp know.
2.   Also if you get a suspension note that pops up, please let him know that as well that way – when you are caught up - he can let medical records know to take you off of suspension.
3.   If you are waiting on a mid-level to complete something bring it to Greg's attention that way he can help speed up the process.

| APONTE | 13 | BRUNIOUS | 38 | GONZALES | 12 | GOODWIN | 1 |
| HALL-MOORE | 2 | MANHIRE | 4 | MEADE | 4 | MILLER | 2 |
| MUTH DIANE | 7 | NIETO | 2 | WILSON | 99 | WINGE | 3 |
| BRADY | 3 | YOUNCE | 2 | BOSSERT | 21 | CHANDLER | 2 |
| CRAWFORD | 2 | THOMPSON | 1 | | | | |

***Thank you Gerry for completing yours this morning before leaving
If you have any questions or need any help, please let us know. We will be glad to help in any way that we can.
Thank you all so much for your help in getting this caught back up…
Stephanie E. Allgood
West Florida Hospital
Titan/Lake Mary Medical Consultants
Stephanie.East@hcahealthcare.com
Sallgood2010@yahoo.com
W) 850-494-6560
C) 850-449-9767
F) 850-494-3204

(red underline added).

79.     HCA also encouraged physicians to sign for tests and procedures in large batches, without adequately reviewing the tests and procedures for which they were being asked to sign.  For example, in January 2013, Patricia Manhire of HCA provided Dr. Williams with a

document entitled "3 ways to sign charts." Ex. 4.  This document instructs physicians to use the options that "will check all the boxes" and/or "process all" signatures at the same time.  *Id.* at 2. Indeed, as discussed above, in one instance, Dr. Williams was asked to sign for 1,700 tests— many of which were for patients he did not personally see.  *See supra* ¶ 74.

80.     HCA uses its Meditech and greeter system in all its hospitals.  HCA implements these systems in each of its facilities in substantially the same way to achieve substantially the same results as described in this complaint.  Thus, not only is HCA implementing its scheme to cause unnecessary tests in West Florida Hospital, HCA is implementing its scheme at Brandon Regional Hospital, South Bay Hospital, Doctors Hospital of Sarasota, and every other HCA hospital.

81.     Dr. Williams worked multiple shifts with Dr. Holly Wilson.  When Dr. Williams inquired about the dangerous greeter system and unnecessary tests, Dr. Wilson informed Dr. Williams that she had worked at multiple HCA facilities and said that HCA was a "money making machine" that had implemented this scheme in all of its facilities.

## C.     HCA's Scheme Causes Unnecessary, Dangerous, and Expensive Tests to Be Run on Patients

82.     Unnecessary tests and procedures can create health risks for patients as well as false positive testing results which lead to more tests, hospital admissions, and increased costs. Unnecessary tests ordered by greeters at HCA have exposed patients to unnecessary radiation exposure[9], risk of infection through IV catheters, hospital infections, and possibly death.

83.     Countless scientific studies over the course of many decades have demonstrated the dangers associated with ionizing radiation—the type of radiation used in x-rays

---

[9]  A single CAT or CT scan can expose a patient to 2000 mrem, or roughly 8 times the average annual exposure.

at CT scans—and consistently recommended that such radiation be used only in appropriate circumstances.[10] Computed tomography or "CT" scans utilize computer-processed combinations of multiple x-ray images taken from different angles to produce cross-sectional images. Thus, a single CT scan exposes a patient to a much greater amount of radiation than a single, two-dimensional x-ray.[11] It has also long been known children are particularly vulnerable to the risks associated with ionizing radiation, including from CT scans.[12] Thus, there is a consensus in the medical field that a CT scan should only be ordered after determining that the benefit of the diagnostic test will outweigh the risk associated with the irradiation.[13] As a result of the known

---

[10] *See, e.g.*, Martin, Diego R.; Semelka, Richard C.  "Health effects of ionizing radiation from diagnostic CT imaging: Consideration of alternative imaging strategies." *Applied Radiography*, (2007) ("It is scientifically accepted that the ionizing radiation generated by medical diagnostic X-ray machines induces neoplasms through damage and alterations to cellular DNA, and that this risk is related to the dose administered. Computed tomography (CT) examinations account for the largest population radiation dose from medical diagnostic studies, with more than 60 million CT examinations performed per year in the United States that represent an estimated 70% of all medical X-ray exposure."); FDA Unveils Initiative to Reduce Unnecessary Radiation Exposure from Medical Imaging. *FDA*. 2/9/2010, available at http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/UCM200085 ("While there is some disagreement over the extent of the cancer risk associated with exposure to radiation from medical imaging, there is broad agreement that steps can and should be taken to reduce unnecessary radiation exposure.").

[11] *See, e.g.*, Brenner, David J., and Eric J. Hall. "Computed tomography—an increasing source of radiation exposure." *New England Journal of Medicine* 357, no. 22 (2007) ("Organ doses from CT scanning are considerably larger than those from corresponding conventional radiography (Table 1). For example, a conventional anterior–posterior abdominal x-ray examination results in a dose to the stomach of approximately 0.25 mGy, which is at least 50 times smaller than the corresponding stomach dose from an abdominal CT scan.").

[12] Armao, Diane M. et al. "Debriefing the brief: it is time for the provision of informed consent before pediatric CT." *Radiology* 275, no. 2 (2015) ("Radiation-induced cancer risk is magnified in children and adolescents because there is more time for the malignancy to manifest (usually decades later) and because their cells divide more rapidly, making them more susceptible."); Brenner, David J. "Should computed tomography be the modality of choice for imaging Crohn's disease in children? The radiation risk perspective." *Gut* 57, no. 11 (2008) ("This issue of paediatric [*sic*] exposure is potentially important because of the increased sensitivity of children to radiation-induced cancer."); http://www.cancer.gov/about-cancer/causes-prevention/risk/radiation/pediatric-ct-scans ("Children are considerably more sensitive to radiation than adults, as demonstrated in epidemiologic studies of exposed populations [and] Children have a longer life expectancy than adults, resulting in a larger window of opportunity for expressing radiation damage.").

[13] *International Atomic Energy Agency Radiological protection for medical exposure to ionizing radiation : safety guide* (2002) ("Medical exposures should be justified by weighing the diagnostic or therapeutic benefits they produce against the radiation detriment they might cause, taking into account the benefits and risks of available alternative techniques that do not involve medical exposure."); Semelka, Richard C. et al. "Imaging strategies to reduce the risk of radiation in CT studies, including selective substitution with MRI." *Journal of Magnetic Resonance Imaging* 25, no. 5 (2007) ("A CT examination may be considered indicated when the benefits of the CT would outweigh any assumed radiation risks."); Martin, Diego R. et al. "Health effects of ionizing radiation from diagnostic CT imaging: Consideration of alternative imaging strategies." *Applied Radiography*, (2007) ("Patients should be given an explanation of the expected benefit in relation to the risk for radiation-induced cancer."); http://www.cancer.gov/about-cancer/causes-prevention/risk/radiation/pediatric-ct-scans ("The benefits of properly

risks of CT scans, there is also a consensus in the medical field that a CT scan should never be ordered in triage, before a complete evaluation of the patient is performed.

84.     HCA's radiology protocols mandated that with the exception of CT scanning of the abdomen for kidney stones, all other CT scanning required the use of a contrast agent (a contrast agent is a substance used to enhance the contrast of structures or fluids within the body in medical imaging). The use of contrast is not required in all cases and is an additional expense. At HCA the CT Technician automatically ordered the contrast and the physician was required to sign for it after the fact. Additionally, when a physician ordered a transvaginal ultrasound, the Radiology Technician automatically ordered a pelvic ultrasound per the hospital's protocols. The extra tests were often not needed and added additional costs to the patient's bills. The emergency room physician would be forced to sign for both ultrasound examinations.

85.     Similarly, HCA protocol mandates that physicians place an Edwards Catheter—a central venous catheter manufactured by the Edwards Life Science Corporation used to administer medication or fluids, obtain blood tests, and directly obtain cardiovascular measurements such as central venous pressure—on every patient prior to admittance to the ICU. Further, HCA protocol is to place the catheter in the internal jugular vein in the neck rather than in the femoral vein—which allows HCA to charge extra for the monitoring device, regardless of whether the patient needs such monitoring.

86.     Dr. Williams refused to place an Edwards Catheter on a patient with low platelets who was at a significant risk for uncontrolled bleeding, and his refusal was noted in the Meditech system. The next morning, Dr. Williams received a telephone call from the hospital's

---

performed and clinically justified CT examinations should always outweigh the risks for an individual child; unnecessary exposure is associated with unnecessary risk. Minimizing radiation exposure from pediatric CT, whenever possible, will reduce the projected number of CT-related cancers.").

Chief Medical Officer who told Dr. Williams that if he didn't comply with hospital protocols, he would be terminated.

87.     HCA also programs its Meditech system to display a sepsis alert based upon the vitals input into the system.  For example, something as benign as a fever may trigger Meditech to display a sepsis alert.  If a sepsis alert appears on the Meditech screen, the greeter orders an array of expensive tests, many of which may be inappropriate and unnecessary based only upon the vitals input into Meditech.  In addition to being expensive, unnecessary sepsis alerts expose patients to significant risk.  For example, an unnecessary sepsis alert might mean a patient is exposed to unnecessary radiation from x-rays and the possibility of phlebitis, hematoma, or cellulitis from needle sticks.  And this problem is compounded as a result of false positives in those tests which, in turn, lead to more unnecessary tests and more patient expense and risk.

88.     Similar to HCA's standard order sets, the SEP alert is an example of HCA limiting and dictating medical decision making.  Medical providers working at HCA are encouraged to blindly accept the tests "recommended" by HCA's computer systems so that HCA can derive revenue from tests that would not have otherwise been ordered.

   **D.     HCA's Systemic Over-Ordering of Tests Causes Claims For HCA Services to Be Coded at a Falsely High Level**

89.     In addition to being expensive and potentially harmful to patients, running additional, unnecessary tests also makes patient visits appear more medically complicated and increases the amount HCA can bill, aside from the costs of the tests themselves, the government for such visits—a practice known as up-coding.

90.     The amount that hospitals are permitted to bill for emergency evaluation and management services depends on the complexity of the visit, which in turn is determined by

the number of medical problems and the extent to which they are addressed. Typically, hospitals maintain an "acuity scale" of Level One through Level Five for each patient visit, where Level One represents the simplest patient visit and Level Five represents the most complex patient visit. The more tests that are administered during a patient visit, the higher the acuity level is for that patient visit—and the higher the acuity level, the higher the charge to government insurers.

91.     The unnecessary tests performed by HCA causes the visits to appear more complex and allows HCA to bill the government at a higher acuity level. In many instances, due to the number of tests ordered by the greeters, the level reached Level Five—which means much higher charges for hospitals services.

**E.     Specific Patient Examples of HCA's Scheme In Practice**

92.     The following patient examples illustrate how HCA's fraudulent greeter system works in practice to cause unnecessary tests and procedures to be performed. The test and procedures discussed below were ordered *before* the patient was appropriately evaluated to determine if the tests and procedures were appropriate—often before taking a medical history and physically examining the patient. In many cases, tests and procedures were performed before a patient received a bed. On information and belief, nearly all of the tests and procedures discussed below were ordered as a result of HCA's pressure greeters to adhere to standing order sets (i.e., protocols) that HCA promulgated.

93.     On October 31, 2012, "Patient A"[14] arrived at the emergency department of West Florida Hospital. Patient A was seen by a greeter in the waiting room at 11:55 pm and complained that Patient A was having back pain. At 12:02 am—only 7 minutes later—the greeter ordered over 20 tests and procedures, including liver function studies. The greeter also ordered a number of tests that would have been appropriate if a heart attack was suspected (e.g.,

_____

[14] Relator will provide actual patient names to HCA under separate cover.

EKG and cardiac enzyme profile).   But Patient A was not placed in an examine room for 20 minutes.   If the greeter genuinely suspected a heart attack was occurring, Patient A would not have been left in the waiting room for another 20 minutes.   Thus, each ordered test was either plainly unnecessary or unnecessary in view of the fact that the greeter did not believe a heart attack was occurring.   Eventually, Patient A was placed in a treatment room and seen by Dr. Williams.   After examining the patient, Dr. Williams diagnosed Patient A with a muscle spasm of the back and determined that the tests and procedures that had been ordered were unnecessary. He attempted to cancel the orders, but the tests had already been performed or the hospital's Meditech system did not permit cancellation.

94.     On October 31, 2012, "Patient B" arrived at the emergency department of West Florida Hospital.   Patient B was seen by a greeter at 7:27 p.m. and complained of a headache.   Approximately 9 minutes later, the greeter ordered numerous tests and procedures, including an IV placement, blood work, urinalysis, and a chest x-ray.   Eventually, Patient B was placed in a treatment room and seen by Dr. Williams.   After examining the patient, Dr. Williams determined that the tests that had been ordered were unnecessary.   He attempted to cancel the orders, but the tests had already been performed or the hospital's Meditech system did not permit cancellation.

95.     On October 30, 20102, "Patient C" arrived at the emergency department of West Florida Hospital.   Patient C was seen by a greeter at 10:07 p.m. and complained of a sore throat.   Approximately 3 minutes later, the greeter ordered a CT scan of the neck, including the use contrast via IV.   Eventually, Patient C was placed in a treatment room and seen by Dr. Williams.   After examining the patient, Dr. Williams diagnosed Patient C with mononucleolis (i.e., the common childhood illness of "mono") and determined that the CT scan was

unnecessary. He attempted to cancel the orders, but the tests had already been performed or the hospital's Meditech system did not permit cancellation.

96.     On November 15, 2012, "Patient D," a Medicare patient, arrived at the emergency department of West Florida Hospital. Patient D was seen by a greeter at 4:48 p.m. and complained of pain in Patient D's left leg. At 5:17 p.m., numerous tests were ordered, including blood work, urine tests, and a prothrombin time test (i.e., a blood clotting test). Eventually, Patient D was placed in a treatment room and seen by Dr. Williams. After examining the patient, Dr. Williams diagnosed Patient D with a knee effusion (i.e., fluid in or around the knee joint) and determined that the test and labs were unnecessary. It was unreasonable to order a prothrombin time test, blood work, and urine tests before doing a physical examination of the patient, which immediately revealed a simple knee effusion. Dr. Williams attempted to cancel the orders, but the tests had already been performed or the hospital's Meditech system did not permit cancellation.

97.     On October 29, 2012, "Patient E," arrived at the emergency department of West Florida Hospital. Patient E was seen by a greeter who determined that the patient was having a suspected drug overdose. The greeter activated HCA's overdose protocol in the Meditech system which included a Lorazepam IV—a sedative for an already overdosed patient. Eventually, Patient E was placed in a treatment room and seen by Dr. Williams. After examining the patient, Dr. Williams determined that the Lorazepam was unnecessary (and unsafe).

98.     On November 13, 2012, "Patient F," a Medicare patient, arrived at the emergency department of West Florida Hospital. Patient F was seen by a greeter at 4:55 p.m. and complained of a bee sting the day before, along with shortness of breath. At 4:58 p.m.—

approximately 3 minutes later—numerous tests were ordered, including hepatic function panel, ISTAT lactic acid, and a sepsis alert.  The hepatic function panel and lactic acid tests were unreasonable because the patient did not complain of anything that would suggest liver problems.  And the sepsis alert was particularly egregious because Patent F clearly did not have an overwhelming infection.  Instead, it was readily apparent that Patient F was simply an elderly person with a non-dangerous bee sting and some anxiety issues.  But HCA pressures its greeters and physicians to over-order tests and adhere to standard order sets rather than apply common sense.  Eventually, Patient F was placed in a treatment room and seen by Dr. Williams.  After examining the patient, Dr. Williams determined that the test and labs were unnecessary.  He attempted to cancel the orders, but the tests had already been performed or the hospital's Meditech system did not permit cancellation.

99.     On November 13, 2012, "Patient G" arrived at the emergency department of West Florida Hospital.  Patient G was seen by a greeter at 11:45 a.m. and complained of a sore throat and body aches.  At 11:58 a.m., numerous tests were ordered, including an IV placement, blood work, and urinalysis.  A CT scan of neck with contrast was also ordered before Patient G was seen by a physician.  Eventually, Patient G was placed in a treatment room and seen by Dr. Williams.  After examining the patient, Dr. Williams determined that the test and labs were unnecessary—particularly the CT scan.  He attempted to cancel the orders, but the tests had already been performed or the hospital's Meditech system did not permit cancellation.

100.    On November 12, 2012, "Patient H," arrived at the emergency department of West Florida Hospital.  Patient H was seen by a greeter at 4:32 p.m. and complained of chest pain.  At 4:34 p.m.—approximately 2 minutes later—numerous tests were ordered, including an IV placement, blood work, urinalysis, and a chest x-ray.  Eventually, Patient H was placed in a

treatment room and seen by Dr. Williams.  After examining the patient, Dr. Williams diagnosed Patient H with acid reflux and/or indigestion and determined that the test and labs were unnecessary.  He attempted to cancel the orders, but the tests had already been performed or the hospital's Meditech system did not permit cancellation.

101.   On November 12, 2012, "Patient I" arrived at the emergency department of West Florida Hospital.  Patient I was seen by a greeter at 9:22 p.m. and complained of shortness of breath.   At 9:31 p.m.—approximately 9 minutes later—numerous tests were ordered, including an IV placement, blood work, and a drug screen.  Eventually, Patient I was placed in a treatment room and seen by Dr. Williams.  After examining the patient, Dr. Williams diagnosed Patient I with a bronchospasm and determined that the test and labs were unnecessary. He attempted to cancel the orders, but the tests had already been performed or the hospital's Meditech system did not permit cancellation.

102.   On November 15, 2012, "Patient J" arrived at the emergency department of West Florida Hospital.  Patient J was seen by a greeter at 10:23 p.m. and complained of pain in Patient J's right rib area.  At 10:38 p.m., numerous tests were ordered, including an ISTAT lactic acid and a sepsis alert.  Eventually, Patient J was placed in a treatment room and seen by Dr. Williams.  After examining the patient, Dr. Williams determined that the test and labs were unnecessary.  He attempted to cancel the orders, but the tests had already been performed or the hospital's Meditech system did not permit cancellation.

103.   On November 13, 2012, "Patient K" arrived at the emergency department of West Florida Hospital.  Patient K was seen by a greeter at 5:10 p.m. and complained of shortness of breath.  At 5:20 p.m., numerous tests were ordered, including a cardiac enzyme panel, a hepatic function panel, and a sepsis alert.  Eventually, Patient K was placed in a

treatment room and seen by Dr. Williams.  After examining the patient, Dr. Williams diagnosed

the patient with bronchitis and determined that the test and labs were unnecessary.  He attempted

to cancel the orders, but the tests had already been performed or the hospital's Meditech system

did not permit cancellation.

104.    On November 15, 2012, "Patient L" arrived at the emergency department

of West Florida Hospital.  Patient L was seen by a greeter at 6:16 p.m. and complained of a

ringing in Patient L's ears.  At 7:05 p.m., tests were ordered, including an EKG and blood work.

Eventually, Patient L was placed in a treatment room and seen by Dr. Williams.   After

examining the patient, Dr. Williams diagnosed the patient with tinnitus and determined that the

test and labs were unnecessary.  He attempted to cancel the orders, but the tests had already been

performed or the hospital's Meditech system did not permit cancellation.

105.    On November 15, 2012, "Patient M" arrived at the emergency department

of West Florida Hospital.  Patient M was seen by a greeter at 2:36 p.m. and complained of a

fever and back discomfort.  The greeter ordered numerous tests, including a CT scan of the

abdomen and an EKG.  Eventually, Patient M was placed in a treatment room and seen by Dr.

Williams.   After examining the patient, Dr. Williams diagnosed the patient with a kidney

infection and determined that the test and labs were unnecessary.  He attempted to cancel the

orders, but the tests had already been performed or the hospital's Meditech system did not permit

cancellation.

106.    On November 27, 2012, "Patient N," a Medicare patient, arrived at the

emergency department of West Florida Hospital.  Patient N was seen by a greeter at 1:48 p.m.

and complained of mild sternum pain after an airbag deployed in a low-speed car accident.  At

2:00 p.m., the greeter ordered numerous tests, including *three* CT scans—including a CT scan of

the brain—and blood work.  Eventually, Patient N was placed in a treatment room and seen by Dr. Williams.  After examining the patient, Dr. Williams determined that the test and labs were unnecessary.  In particular, he determined that it was unnecessary and unreasonable to order CT scans where the patient did not have any head or neck injury and simple x-rays would have sufficed to diagnose any chest-related injury that might have resulted from the airbag.  He attempted to cancel the orders, but the tests had already been performed or the hospital's Meditech system did not permit cancellation.

107.   On November 27, 2012, "Patient O," a Medicare patient, arrived at the emergency department of West Florida Hospital.  Patient O was seen by a greeter at 1:48 p.m. and complained of mild sternum pain after an airbag deployed in a low-speed car accident.  At 2:00 p.m., the greeter ordered numerous tests, including *three* CT scans and blood work.  Eventually, Patient O was placed in a treatment room and seen by Dr. Williams.  After examining the patient, Dr. Williams determined that the test and labs were unnecessary.  He attempted to cancel the orders, but the tests had already been performed or the hospital's Meditech system did not permit cancellation.

108.   On November 26, 2012, "Patient P," a Medicare patient, arrived at the emergency department of West Florida Hospital.  Patient P was seen by a greeter at 8:07 p.m. and complained of fever, dizziness, and pain in Patient P's flanks.  At 8:10 pm—approximately 3 minutes later—the greeter ordered numerous tests, including an ISTAT B-Type Natriuretic Peptide and a cardiac enzyme profile.  Eventually, Patient P was placed in a treatment room and seen by Dr. Williams.  After examining the patient, Dr. Williams diagnosed the patient with a kidney infection and determined that the test and labs were unnecessary.  He attempted to cancel

the orders, but the tests had already been performed or the hospital's Meditech system did not permit cancellation.

109.     On November 26, 2012, "Patient Q" arrived at the emergency department of West Florida Hospital.  Patient Q was seen by a greeter at 4:16 p.m. and complained of abdominal pain.  At 4:20 p.m.—approximately 4 minutes later—the greeter ordered numerous tests, including a CT scan with contrast.  Eventually, Patient Q was placed in a treatment room and seen by Dr. Williams.  After examining the patient, Dr. Williams diagnosed Patient Q with gastritis and determined that the test and labs were unnecessary.  He attempted to cancel the orders, but the tests had already been performed or the hospital's Meditech system did not permit cancellation.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Presentation of False Claims pursuant to 31 U.S.C. § 3729(a)(1)(A)**

110.     Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

111.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendant has knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

### SECOND CAUSE OF ACTION

**Making or Using False Record or Statement to Cause Claim to be Paid pursuant to 31 U.S.C. § 3729(a)(1)(B)**

112.     Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

113.     As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendant has knowingly made, used, or caused to be made or used, false records or statements—i.e., the false certifications and representations made or caused to be made by Defendant—material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

## THIRD CAUSE OF ACTION

**Making or Using False Record Statement to Avoid an Obligation to Refund Pursuant to 31 U.S.C. § 3729(a)(1)(G)**

114.     Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

115.     As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendant has knowingly made, used, or caused to be made or used, false records or statements—i.e., the false certifications and representations made or caused to be made by Defendant—material to an obligation to pay or transmit money to the Government to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the Government.

## FOURTH CAUSE OF ACTION

**Presentation of False Claims pursuant to Fla. Stat. § 68.082(a)**

116.     Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

117.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendant hasknowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of §68.082 (2)(a) Fla. Stat. J.

## FIFTH CAUSE OF ACTION

**Making or Using False Record Statement to Cause Claim to be Paid pursuant to Fla. Stat. § 68.082(2)(b)**

118.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

119.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendant has knowingly made, used, or caused to be made or used, false records or statements—i.e., the false certifications and representations made or caused to be made by Defendant—material to false or fraudulent claims in violation of Fla. Stat. § 68.082 (2)(b).

## SIXTH CAUSE OF ACTION

**Makin or Using False Record Statement to Avoid an Obligation to Refund Pursuant to Fla. Stat. § 68.08(2)(g)**

120.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 109 of this Complaint as if fully set forth herein.

121.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendant has knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay to the Government.

## VII.   DEMAND FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States Government and the State of Florida, demand judgment against Defendant, ordering that:

**As to the Federal Claims:**

a.      Pursuant to 31 U.S.C. § 3729(a), Defendant pays an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's action, plus a civil penalty of not less than $5,000 and not more than $10,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*.;

b.      Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(d) of the False Claims Act and/or any other applicable provision of law;

c.      Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law; and

d.      Relator be awarded such other and further relief as the Court may deem to be just and proper.

**As to the State Claims:**

a.      Pursuant to Fla. Stat. § 68.082(2)(g), Defendant pays an amount equal to three times the amount of damages the State of Florida has sustained because of Defendant's action, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of the Florida False Claims Act;

b.      Relator be awarded the maximum amount allowed pursuant to § 68.085 of the Florida False Claims Act and/or any other applicable provision of law;

c.      Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by Fla. Stat. § 68.086 and any other applicable provision of the law; and

d.      Relator be awarded such other and further relief as the Court may deem to be just and proper.

## TRIAL BY JURY

Relator hereby demands a trial by jury as to all issues.

Dated this 22nd day of July, 2016.

                Respectfully submitted,

                RELATOR DAVID WILLIAMS, D.O.


                s/ James D. Young _____
                James D. Young (Fla. Bar #567507)
                Morgan & Morgan Complex Litigation Group
                76 South Laura Street
                11th Floor
                Jacksonville, Florida  32202
                (904) 361-0012
                jyoung@forthepeople.com


                Matthew K. Organ, *pro hac vice* pending
                Robert D. Leighton, *pro hac vice* pending
                Emily D. Gilman, *pro hac vice* pending
                Goldberg Kohn Ltd.
                55 East Monroe Street, Suite 3300
                Chicago, Illinois  60603
                Tel:  (312) 201-4000
                Fax:  (312) 332-2196

# Exhibit 1

## WFH - ED Physician Orientation

**OVERVIEW OF ORIENTATION**

**Prior to the on-site hospital orientation:**
- Coming soon March 2013 – PDoc on line physician education module
- Coming soon – on line procedural sedation educational module

**Full time, part time Physicians & MLPs: 4  or 5 hour in-house training prior to your first day**

| HOSPITAL ORIENTATION: ½ hour locum;  1 hour full time/part time | | Who will orient you | Check Done |
|---|---|---|---|
| 30 min | Name badge,  Medical staff office requirements & Parking Pass | Verteen | |
| 30 min | PACs system | Gary | |
| 15 min | ED Consumer Service Standards (Weekday) | Michelle Voizin | |
| 15 min | Sign the prescription form –to be faxed to all the local pharmacies | Greg | |
| 30 min | QI - Performance Improvement (Sepsis, Stroke, MI, Pneumonia) | Jackie | |
| **ED ORIENTATION:  ½ to one hour** | | | |
| 30 min | The ED department orientation (See below) | Dr. Manhire or Dr. Meade | |
| **ED COMPUTER OREINTATION:  two hours** | | | |
| 2 hour | Computer charting & order entry | Jeremy, Stephanie, & /or Jennifer | |

<mark>GENERAL ED ORIENTATION INFORMATION:</mark>

**Welcome!  Below is some information about our ED.**

- **Parking:**

  o  The physician parking is located by the helo pad in front of the ED entrance. It is a gated lot with a yellow bar.  You will be given a clicker to open the gate.  You need the clicker to get in the lot.

  o  <u>LOCUMS:</u> It is important that you return the lot clicker at the end of your last shift to the Assistant ED Nurse Manager.  You don't need the clicker to get out of the gate.   If you don't return the clicker, other locums may be forced to park across the street which is a significant distance from the ED. So, please help us make your and other locum shift here easier.

- **ED Access Codes for the Doors**

  o  The key pads access codes change:  put in the month and year, then star.  Exp: Jan 2013; 0113*

- **Lockers:**

  o  <u>Full & Part Time Physicians:</u>  You will have a locker in the ED Physician office.  The access code to the office will be given to you on your first day.
  o  <u>Locums or if you need a Day Locker:</u>  Next to the ED administration offices is an office with lockers and locks.  Leave the key in the open lock when you leave.

- **Mail Boxes:**  Located in the ED Physician office.

- **Call Schedule :**  The call board is only for unattached patients.  If the patient has a surgeon form– then you need to call that surgeon.

- **Call the surgeon prior to transfer / discharge home for post-operative patients:**

  o  **Ophthalmology:**  Although we do not have ophthalmology coverage, the take call regarding their patients and post-operative patients.  Please call the ophthalmic surgeon prior to transfer.
  o  **Any surgical patient postop** – call the surgeon, even if they are sent home if under active care for the recovery.

- **Transfers & Admits:**

  o  **Accepting patients from other institutions**:    If the patient has had a full evaluation, have the referral physician call the Hospitalist (or surgery if appropriate) to make them a direct admit.  Ask them to call the transfer line (operator will transfer them) to assist with the transfer process.

  o  **Transferring patients:** If your accept a transfer, you need to fill out a accepting transfer form.  Ask the HUC for this paper prior to talking to the physician.  We have a transfer line available to help coordinate patient transfers to and from our institution. We have a transfer line available to help coordinate patient transfers to and from our institution.

    ▪  <u>SPECIAL NOTE:</u>  For ENT, Ophthalmology, Pediatrics Medicine admits, Oral Surgery, Plastics, uncovered ENT and uncovered hands – make this an ED to ED transfer. Do not call the specialist for those services

- Ophthalmological emergencies – we have no coverage. Suggest the call Sacred Heart or Baptist
- ENT (on occasion). Most of the days we have ENT coverage. You need to check the call schedule.
- Facial Trauma-  Transfer to Sacred Heart or Baptist. ENT does not take Facial.
- Oral Surgery – Transfer to Sacred Heart or Baptist
- Pediatrics
  - Medical admits – All medical admits less than 18 years of age must be transferred to Sacred Heart.
  - Surgical admits – Some surgeons will accept down to age 12 years of old. Any younger will need to be transferred to Sacred Heart.
  - Psychiatric patients.  Pediatric – Send to Baptist Hospital.
- Burns. Send to University of South Alabama Burn Center, Mobile, Alabama. Ask the HUC to coordinate the transfer. The Assistant ED Nurse Manger will assist in the patient preparation and transfer.  If USA is unavailable, our second string is University of Alabama at Birmingham, or third string is Joseph M Sills Burn Center / Doctor's Hospital in Augusta.
- Plastic Surgery – we have no coverage, send to Sacred Heart
- Hand Surgery (on occasion). Some physicians will take the patient. Dr. Jason Marshall does hands and will take out patient follow ups.
- Neurosurgical Services. Since our neurosurgeons do not have intracranial privileges , when intracranial bleeds come to ER **AND** Dr. Wolff or Dr. Newman are on –the ED doc can pursue immediate transfer to either Baptist or Sacred Heart to meet the pt needs promptly. (Without a call to either of these two neurosurgeons).   Dr. Schmitz has agreed to work with our ED docs to determine if the pt is surgical candidate and will advise ED docs  next step.

  o **Admits**
  - The Hospitalist accept the majority of the admitted patients.
    - Neurosurgery consults; hospitalist admit for them. (THIS MAY CHANGE)
    - Almost 100% of the non-surgical specialties admit to the hospitalist.
    - Non-STEMIs,  admit to the Hospitalist.   Hospitalist to consult cardiology.
    - Ortho hip fractures >65 years of age.  Please  call ortho first.
  - Exceptions to the hospitalist admitting the pts
    - General surgery admit their own patients
    - Oncology admit their own patients if actively receiving chemo treatment.
    - Nephrology admit their own patients if the patient is End Stage Renal Disease and is on Hemodialysis.
    - Cardiology admit STEMI patients.
    - Ortho hip fractures <64 years of age.
    - Psychiatric patients. Note, we accept most adult psychiatric patients as we have an admit unit.

- **Psychiatric and Alcohol intoxication:**
  o Current policy prohibits any family members from seeing / talking to the psychiatric patients who are in the locked unit or have a Baker Act against them.
  o The alcohol policy discharge policy is being revised as of 1/20/13.
  o You will need to fill out a Reverse Baker Act form if it is determined the pt is not suicidal or should not be admitted.

- **In-House Code Coverage-for Physicians** (THIS MAY CHANGE SOON)

  o **The ED physician responds to all in-house cardiac arrests & code calls.**
  - **Non-hospitalists Patients:** You will run the code and manage all aspects of the code including the airway, and rhythm disturbance.

- **Hospitalist Patients:** You and the hospitalist will run the code together. You will manage the airway.  After this, ask if your assistance is necessary, and if not you can return to the ED.
  - **Documentation –** Make a note in the progress note as to a brief summary:  'code called; pt intubated, rhythm restored, pt transferred to ICU.  Care continued by Dr. H. O.  Pitalist".  You are to use a T-sheet code summary sheet for your dictation.  It is a paper sheet located in triage. Put the original T-Sheet on Stephanie or Dr. Manhire's desk.

- **Physician & MLP Portable Phones:**     As of January 16th, we are increasing the number of phones so everyone will have one.  They will be labeled by the shift time.

- **Food:** Lunch is provided in the doctor dining room during the weekdays.  Snacks are available for other shifts. You need to pay for the food at Subway.

- **Library Resources:**  Library intranet has a large reference database which includes Up-To-Date, etc.

- **Radiographic studies,  Ultrasounds, and Lab tests:**

  - **Follow-up advice regarding X-ray and cultures:**
    - Please don't ask the patient to call back for the final read results on the X-rays and cultures results.  Since the staff cannot verify the patient ID, they can't give out the information as it may violate HIPAA laws.  We have a discrepancy process, if we find a discrepancy we call the patient.  Otherwise, the pt can see their PMD for follow up results.  If they don't have a doctor, they can go to the Escambia Community Clinic and establish care with a practitioner or The Health and Hope Clinic.
  - **Wet Reads:**
    - The Radiology Associates of Pensacola  will view CT, MR, US and NM studies between the hours of 6 P.M. and 10 P.M. (weekends 5 P.M. – 10 P.M.) utilizing the WINRAD teleradiology system.  The SDI physicians in Tampa, FL will view CT, MR, US and NM studies between the hours of 10 P.M. and 7 A.M.
  - **Ultrasounds:**  Available 24/7.  If we suspect kidney stones, radiology requested that we order a renal ultrasound initially, on individuals less than 30 to reduce radiation exposure.
  - **MRI:**  Hours from 7am to 5pm.  There is an on call person.
  - **CTA Chest for PE**
    - Per hospital protocol, any female under 30 year of age who requires a PE study, must have a VQ first. This is to reduce the radiation exposure to the breast tissue.   You can try calling the radiologist if you want an exception, however be aware that getting a CTA on a female under 30 years is very difficult.  Also, realize you need to call in the night shift V/Q can technician come home.  Therefore, between the test and the tech coming in from home, the test will take hours.  Let  the patient know about the delay.  Also, if the study is equivocal, let them know you may need to order a CTA of the chest after the V/Q is done.  Suggestion: The HUC needs to call in the tech – ask her to do so when you place the study.
  - **Interventional Radiology**
    - Available 24 / 7.
  - **CT Abd & Pelvis:**
    - **No trauma:** Our institution requires all CT Abd and pelvis have radio contrast dye.  It takes a mean of 50 minutes for administration and 90 min to complete the study.  Make the patient aware that the study will take about 2 ½ hours prior to obtaining test results.
    - **Trauma:**  No oral contrast required.  The only way to order this is to put in an order for CT oral and IV contrast and in the notes put Trauma; no oral contrast
    - **Renal Protocol:** No Oral Contrast required
  - **Discrepancies - Radiology final reads and Cultures:** We have a process in place to capture the missed fractures, incidental findings, and culture results review.  Final imaging and culture results are reviewed

by nursing for potential discrepancies.    If the RN asks you to review a radiographic read discrepancy, please do so.  Most likely, they will not be your patient, but it is important that we take action on the abnormal finding during your shift.

- **ED Equipment:**

  - *Airway:*  LMA's, Gum Elastic ETT Introducer, QuickTrach Adult and Peds, and GlideScope.
  - *Chest:*  Thoracic Vents, Chest Tube trays, Thoracotomy tray.
  - *Vascular:*  Central and Art Line Kits in Trauma Room, EZ-IO Bone Drill.
  - *ENT:*  Rapid Rhino and Rhino Rocket
  - *Ophthalmology:*  Slit-lamp, Black Light with magnifying lens.
  - *Ortho:*  Tech will apply your cast –BE SURE TO CHECK AND DOCUMENT THE CIRCULATION, SENSITIVITY, & MOVEMENT POST SPLINT PLACEMENT.
  - *Wound:*  We will have suture cart available as of Jan. 16th, 2013.
  - *ED Bedside Ultrasound:*  We have two older models, we have ordered a new one in January 2013.
  - *Velcro splints & Ankle air splints -*  available after about Feb 1, 2013
  - *Walking boots*  *No longer stock item after February.  You can write an outpatient prescription if they need one.*

## Quality Improvement

- **STEMI:**  We are a primary PCI facility.  Ask the Assistant Nurse Manager to call a **STEMI Alert.**

- **Stroke:**  We are a Certified Stroke Center.

  - We have Neurologist on call via Robot – Tele-Neurology –it is a great system!!!!   We want you to use the Neurologist via Telemedicine to help guide your decision making.
  - The RN will activate the **Stroke Alert** based on the symptoms of the patient.  It is <u>not</u> required for the ED physicians to see the pt prior to the code stroke activation.
  - Stroke Alert via EMS always go to the CT scanner first unless they are unstable.
  - We have a 4 ½  hour TPA window.

- **Sepsis:**  We do follow the Early Goal Directed Sepsis Guidelines for treatment for septic patients.  Important: the pneumonia antibiotics are listed under ORDERSETS.  You need to click on the <mark>+</mark> to open up the information box to give you the hospital recommended suggestions for treatment.

  - <u>The Meditech system has a screening tool:</u>

    - If you see a **grey** <u>SEP</u>, it indicates the pt has a positive screen.   If you see a **Red** <u>SEP</u>, it indicates the patient has met the criteria for severe sepsis.  Please review the pt history & diagnostic tests and take appropriate action if indicated.

Red SEP seen on the main Meditech tracker board.

  - <u>Common areas of fallout</u>:  Please obtain Lactic acid point of care and blood cultures if you suspect sepsis, patient meets SIRS criteria.  Please remember to give 20 ml/kg actual body weight bolus over 30 minutes regardless of co-morbidity if hypotensive.

- o <u>QI for the ED Severe Sepsis and Septic Shock patients:</u> --- ED Goal -is to achieve 100% on the following 5 ED Sepsis Bundle indicators: 1. Lactate, 2. Blood Cultures,  3. Antibiotic,  4. Fluid Resuscitation, 5. Vasopressors, & *6.  Central line, if indicated.*

- o <u>Central Lines:</u> Although the central line is not an ED indicator, it part of the second part of the sepsis bundle.   Make at least one attempt in placing a central line in the ED. If unable, you can call anesthesia to place a Power PIC line.   Because of the line insertion delays, it is important that we insert the central line prior to transferring the patient upstairs.  Use an Edward Catheter if possible as it has SVO2 capabilities.  The IJ approach is best for this catheter as it is stiffer  catheter.  There is a second guide wire you can use which is more flexible than the one in the box.


- **Procedural Sedation**:   Currently, you may give moderate sedation.  For deep sedation, you must call anesthesia. Due to remote issues, physicians cannot give fentanyl in our institution unless you are an anesthesiologist.   In February 2013,  the Medical Executive staff will be considering a proposal for ED physicians to give both moderate and deep sedation.

- **EKG:**  EKG's interpretation need to be loaded in the computer.

- **Major Disasters and Code Internal Disasters:**  Call the House Supervisor in Petoskey if you have any questions.

- **Sexual Assault / SANE:**  Because this may involve testifying, if you can, give this case to one of the full time ED physicians.  We have a SANE nurse available some of the time, if they are not on call then any nurse can help you with the SANE kit.

- **Traumas:**  We are not designated a trauma center, however we do get lower acuity traumas as well as penetrating trauma (GSW & stabbing) who walk-in from the street.  The trauma room will be refitted to take care of these patients as of Jan 30, 2013.

- **Bridging orders:**

  - o It is a one page order sheet.  Please ask the attending physician if you can use Bridging orders.
  - o The units have different skill levels – if unsure, ask the Assistant Nurse Manager.  They will tell you who can take NTG being titrated, etc.
  - o Write orders to cover for the next 2 or 3 hours of care. (Exp: breathing treatments, pain medication, etc.)

  - **Quality Improvement Issues – Focus improvement:**

    - o Year 2013.  Process flow improvement (Efficiency) and Physician's see all patients.
    - o Year 2014.  Core measure and OP measurement improvement & HCAPS


  - ▪ **Unique issue to this area – Infectious diseases**

    - o We have the one of the highest rate of Syphilis in the nation. Many cases of Primary, Secondary, and Tertiary cases are being diagnosed in our community.  Keep Syphilis in your differential.


  - ▪ **Greet the patient & Triage Orders:**

- o As required by the government, a MLP or physician must greet the pt within a specific time period to avoid losing reimbursement.  At our institution, the Midlevel practitioners (MLP) greet the patient upon arrival.  If the MLP is unable to greet the patient, then you will need to.  To help reduce the pt time in the ED, the PA will place orders  using an standing orders set.  Important!!  Please do not criticize the MLP's when they place orders you do not agree with.  They are doing the best they can.  It is fine to thank them for helping, and then educate them on what you would recommend they do differently next time.  Contact the medical director, if you have any questions.

- ▪ **Working Together:  Physician Assistant (PA) & Nurse Practitioners (NP):**

  - • **PA/NP Patient Flow**:
    - o The PA/NP will put their initials and the ED physician's initials on the Electronic Grease board.
    - o The PA/NP will assess diagnosis, treat, perform procedures (such as splint application or suture), write prescriptions and discharge the patient.
    - o The PA/NP will "staff," (give report) to one of the ED physicians after they see the patient. The ED physician will also see the patient and write a brief note.
    - o If the patient becomes critical, the RN will call the PA/NP and the ED physician STAT.
    - o Patient Concerns / Med requests:  The RN will first talk to the PA/NP.  If the RN feels more discussion is needed, then they will ask for a patient care conference which will include the PA/NP and ED physician.
    - o Procedures, you need to be present for the key portion of the procedure – be sure to include this in your chart note.
    - o Prior to patient discharge, admit or transfer – the MLP will talk to you about your patient.
    - o For both the NP and the Physician: please document you both looked at the X-ray at night.  The PA/NP will include in the chart: "Patient seen with Dr….." , "Patient discussed with Dr…….", "Discuss disposition with Dr……"
    - o There are two ways to chart the  your supervising note which includes a brief assessment and medical decision making note.  See below

***There are 2 methods to document the***
***Your pt examination & medical decision note of patients you have seen with the PAs/NPs***

| | |
|---|---|
| **METHOD 1**<br><br>1) At time of signing the MLP charts, put a note regarding your assessment and medical decision making.<br><br><br><br>Example:<br>The patient had bilateral wheezing after two Duonebs. Although improved, continues to have wheezing and 5 word conversational dyspnea. Plan; will admit. Reviewed X-ray with MLP – no infiltrate. | 100% of the patient's need to be seen by the physician.<br><br>DO NOT USE THE "I agree with (MLP) findings and plan" unless YOU DID NOT SEE THE PT.<br><br>**IMPORTANT – DOCUMENT YOU REVIEWED THE XRAY WITH THE MLP IF YOU ARE WORKING NIGHTS.** |

| | |
|---|---|
| **METHOD 2 –**<br><br>**YOU MAY WANT TO USE THIS METHOD FOR MORE COMPLEX CASES.** | Click on "Create a NEW Blank – Same as Selected User".<br><br>Fill in the basic info<br>Brief Hx – exp: Cough x 5 days, severe DIB, Fever<br><br>Brief exam – Decrease LOC, resp distress, bilateral rales, weak pulses.<br><br>Medical decision making: Pt with septic shock due to pneumonia. Lactic acid 5.7. BP 82/43 initially, after fluid bolus 101/52. Sepsis bundle initiated of IV fluids, lactic acid, blood cultures x 2, antibiotics, and vasopressor for MAP<65. |

- **Patient Flow and Your Team Assignment**

- o The MLP and ED physician will team up so that the ED physician will see 100% of all ED patients.
- o How the ED physician & MLP team will work.

| | South Hall | North Hall | CODE Response |
|---|---|---|---|
| **Physician** | 7 am – 5pm<br>3 pm- 1am | 10 am-9am | |
| | 9 pm- 7am | At 9pm, either the 3pm doc or the 9pm doc will  to North hall<br><br>9pm and 3pm physician to talk – and decide who will go to North hall. | <u>As a general rule</u><br>Code Call –7 am doc until 10am<br>Then the 10am doc takes code call until 9pm<br>Then the 9pm doc takes code call until 7am |

| | South Hall | North Hall | Triage |
|---|---|---|---|
| **MLP** | 7 am-7am<br>9am-9pm<br>7 pm-7am | 12 am-12am | 11 am-11pm |

- **COMMON ORDER ENTRY PROBLEMS WHEN STARTING- Meditech:**

- o **Urine Cultures:**  The UA reflexes a UCIF, meaning that it the specimen meets criteria it will get a culture off the UCIF order.  Don't order a urine culture is it is a duplicate order.  If you want a urine culture (such as in the case of pediatric patient), you need to call the laboratory technician and request that they perform the culture regardless of what the UA showed.
- o **Respiratory studies:**  You need to look under REQUEST (REQ) to find the respiratory orders.  This is an HCA Meditech category name.  (As of 1/13 – this is being fixed.)
- o **Favorites:**  The sooner you make favorites, the better it is
- o **ED frequency:** As a general rule, don't order ED x 2 of anything.  Especially provental inhalers and IV solution.  For some reason the order does not translate well and the nurses have a hard time interpreting it. (Computer translation problem.)
- o **Add On Tests.**  If there is blood and urine in the lab.  You can place an order "Add on Test" or "AOT".  In the text – type in the test you want to add on.  You do not need to order the test separate.  If you order the test, the patient will receive a second phlebotomy stick.
- o **The information section in Pneumonia medication orderset is collapsed –** it is important to click on the left **+** to open up the information box to give you the hospital recommended suggestions for treatment.

- **Common T-sheet Mistakes:**

- o You have no or incomplete clinical impressions. No probable or possible diagnosis are codable.  You chart will be sent back to you to add and addendum.
- o If you did not lock the chart without a clinical impression – it is very easy to do this.
- o You do not take ownership from the Scribe.
- o Vicodin - Not filling in the Vicodin 5 mg/325 mg strength (the RX is missing the Tylenol strength.)

- o   You forgot to add you Medical License Number.

- **Dress Code:**

  - o   Scrubs are not provided.   In an effort to provide a professional image and to set our physicians apart from other healthcare providers, listed below are guidelines for attire in the emergency department.   All ED physicians/AHPs should adhere to the Titan guidelines:

    - o   New and clean monogrammed scrubs (scrub top with slacks are acceptable) .   White coat optional. If worn, white coats should be laundered frequently as they can be a fomite.   *OR.*   Dress shirt for men and a blouse for women (both should be worn with a name tag).   Jeans, cloth tennis shoes and other sports wear are not acceptable.
    - o   Dress or athletic shoes worn with scrubs should be leather**.**

- **Coming Soon:**
  - o   **PDoc will  have a soft go live March 16th, and a full go live March 26th**  We will no longer be using T-sheets after this time.

**PHYSCIAN CONTACT**
Dr. Patty Manhire, ED Medical Director
Or John Meade, Assistant ED Medical Director

*For modifications or suggestions on changes to this document, contact the ED Medical Director.*

# Exhibit 2

**From:** Gregory.Makos@hcahealthcare.com
**Sent:** Friday, November 09, 2012 12:36 PM
**To:** David.Williams@cfl.rr.com
**Subject:** FW: **URGENT** Titan Group- *HIGH DELINQUENT CHARTS HPF*

Thanks Again,
Greg Makos
West Florida Hospital
Titan/Lake Mary Medical Consultants
Gregory.Makos@hcahealthcare.com

---

**From:** Jaime Aleman [mailto:J.Aleman@titandoctors.com]
**Sent:** Friday, November 09, 2012 11:17 AM
**To:** Makos Gregory
**Subject:** Re: **URGENT** Titan Group- *HIGH DELINQUENT CHARTS HPF*

He is correct, the one thing that may not be clear to the doctors is to sign the orders placed under their name at the end of the shift. That is what Dr Williams may be talking about. Anytime you work there are dozens of orders we dont see.

Jaime J Aleman MD            Sent from my iPhone

On Nov 9, 2012, at 10:26 AM, "Gregory.Makos@hcahealthcare.com" <Gregory.Makos@hcahealthcare.com> wrote:

This was the initial response I got back from Jeff Chandler this morning about your previous email.  I just wanted to keep you posted and if you wanted to relay the message to Dr. Gyarmathy or Dr. Aleman you are more than welcome to.  Thanks for your time and have a great weekend.

Thanks Again,
Greg Makos
West Florida Hospital
Titan/Lake Mary Medical Consultants
Gregory.Makos@hcahealthcare.com

---

**From:** Jeff Chandler [mailto:jbchandler@cox.net]
**Sent:** Friday, November 09, 2012 10:18 AM
**To:** Makos Gregory
**Cc:** r.gyarmathy@titandoctors.com; j.aleman@titandoctors.com
**Subject:** RE: **URGENT** Titan Group- *HIGH DELINQUENT CHARTS HPF*

Greg,

That would have to be addressed with Dr. Gyarmathy or Dr. Aleman.  Currently the processes is that while in Triage the midlevels initiate orders under any of the physicians that are working at that time.  That has always been the process.  I don't think there are any exceptions.  So, just by virtue of being a physician working that day, triage orders may be placed by the midlevel in triage under their name.  If the process needs to change that would be up to either Dr. Gyarmathy or Dr. Aleman.  Thanks!

Jeff

---

**From:** Gregory.Makos@hcahealthcare.com [mailto:Gregory.Makos@hcahealthcare.com]
**Sent:** Friday, November 09, 2012 7:49 AM
**To:** jbchandler@cox.net
**Subject:** FW: **URGENT** Titan Group- *HIGH DELINQUENT CHARTS HPF*

Good Morning Jeff,

I wasn't sure if there was anything from Dr. Williams email below that needed to be address with the mid-levels or not.  I advised him to bring up his concerns with the mid-levels during his next shifts here at West Florida Hospital.  Let me know if you want me to relay any other message to him or not.  Thanks and have a great day.

Thanks Again,
Greg Makos
West Florida Hospital
Titan/Lake Mary Medical Consultants
Gregory.Makos@hcahealthcare.com

---

**From:** David Williams [mailto:David.Williams@cfl.rr.com]
**Sent:** Friday, November 09, 2012 7:09 AM
**To:** Makos Gregory
**Subject:** Re: **URGENT** Titan Group- *HIGH DELINQUENT CHARTS HPF*

Mr. Makos:

   At the end of my last shift I made sure all my charts were locked and I co-signed the delinquent mid-level charts in the T-system. I received a voicemail last night from Ray Gyarmathy, the president of Titian,urging me to sign off on my charts. It appears that there are 1700 tests ordered in Meditech or HPF under my name for 217 patients, many of which I did not personally take care of.  It appears these are tests and treatments that were ordered by the hospital staff and mid level providers in triage. I have gone ahead and co-signed these in Meditech but in the future I would like to limit my signatures to patients I actually took care of. Please let me know if there is anything else you need.

   -DWilliams

**From:** Gregory.Makos@hcahealthcare.com
**Sent:** Thursday, November 08, 2012 1:52 PM
**To:** david.williams@cfl.rr.com ; vs561229@comcast.net ; ataladriz@pol.net ; whytekirk@yahoo.com ; SLWalkerARNP@aol.com ; 7brady@msn.com ; prinpalms@aol.com ; dmuthmd@aol.com
**Cc:** J.Congo@titandoctors.com ; J.Aleman@titandoctors.com ; r.gyarmathy@titandoctors.com
**Subject:** **URGENT** Titan Group- *HIGH DELINQUENT CHARTS HPF*

**URGENT** Please see the chart below which was sent to me today from the HIM Director at West Florida Hospital.  This chart will show you the number of unsigned charts in HPF (h-Care portal).  Please take a moment to login remotely today to clear these out.  I have copied Dr. Aleman and Dr. Gyarmathy to make them aware of all requests.  Should you experience any issues logging into the system please call 888-252-3397 for 24/7 provider support.  Also, you can call Jennifer Krohn at 850-494-4162, I believe she is the one who initially setup your remote access when you started at West Florida.  Let me know as SOON as these are completed and I will inform Valerie Santos, the HIM Director.  Thanks for your time.

Further information for reference….also I have attached a power point that shows you how to access and sign incompletes in the HCare portal.

**The hcare portal…where you sign and co-sign updates on orders and written/verbal orders…it is generally in the tool bar (Launchpad) at the top of the remote desktop.**

Thanks Again,
Greg Makos
West Florida Hospital
Titan/Lake Mary Medical Consultants
Gregory.Makos@hcahealthcare.com

---

**From:** Santos Valerie
**Sent:** Thursday, November 08, 2012 12:22 PM
**To:** Allgood Stephanie; Makos Gregory; Tinch Marjorie
**Cc:** Stallings Terry; Wroten Debbie; Santos Valerie; Terrell Lisa; Seaber Natalie; Juba Pamela; Krohn Jennifer
**Subject:** Titian Group- *HIGH DELINQUENT CHARTS*
**Importance:** High

Margie/Greg/Stephanie

I am working daily on monitoring our increase delinquency rates. The physicians below are from Titian.

Please work with your group on resolving his/her delinquent records as soon as possible. I've CC'd Jennifer Krohn in case your physician is having problems accessing HPF. Remote Access is available to resolve these accounts as well.

If your physician has left, please coordinate with me on how your physician will like to resolve their charts (i.e. send the files via FEDEX to a location to resolve.)

'Thank you for your assistance with resolving these charts.

| PHYSICIAN NAME | <30 | +30 | +60 | +90 | +120 | TOTAL |
|---|---|---|---|---|---|---|
| Williams,David Thomas | 48 | 168 | 1 | 0 | 0 | 217 |
| Sichewski,Vernon R | 1 | 66 | 2 | 0 | 0 | 69 |
| Taladriz,Arturo | 1 | 60 | 0 | 0 | 0 | 61 |
| Whyte,Kirk R | 0 | 33 | 0 | 0 | 0 | 33 |
| Tyulmenkov,Valentyn | 0 | 30 | 0 | 0 | 0 | 30 |
| Zaman,Hasanuz | 9 | 29 | 0 | 0 | 0 | 38 |
| Shams Esshaghi,Kiumars | 70 | 17 | 0 | 0 | 0 | 87 |
| Manginani,Sridevi | 14 | 14 | 0 | 0 | 0 | 28 |
| Quiray,Lourdes Ferrer | 1 | 6 | 0 | 0 | 0 | 7 |
| Fitzgerald,Mekeshia S | 47 | 4 | 2 | 3 | 2 | 58 |
| Walker,Sandra L | 5 | 4 | 2 | 0 | 0 | 11 |
| Smith,Bryan J | 0 | 2 | 7 | 56 | 1 | 66 |
| Araya,Christina M | 31 | 2 | 0 | 0 | 0 | 33 |
| Brady,Craig A | 8 | 1 | 0 | 0 | 0 | 9 |
| Castro,Paul T | 0 | 1 | 0 | 0 | 0 | 1 |
| De La Paz,Yira Larissa | 19 | 1 | 0 | 0 | 0 | 20 |
| Dujour,Roxanne | 11 | 1 | 0 | 1 | 0 | 13 |
| Mayotte,Peter T | 0 | 1 | 98 | 0 | 0 | 99 |
| Muth,Diane M | 12 | 1 | 0 | 0 | 0 | 13 |
| Rao,Rammohan S | 1 | 1 | 3 | 0 | 0 | 5 |
| Saint Fleur,Hurline | 42 | 1 | 0 | 0 | 0 | 43 |
| Schreiber,Michael L | 0 | 1 | 0 | 0 | 0 | 1 |
| Stanley,Katherine K | 0 | 1 | 0 | 0 | 0 | 1 |
| Defour,Fulton G | 2 | 0 | 0 | 1 | 8 | 11 |
| Katharani,Padmani K | 0 | 0 | 0 | 0 | 6 | 6 |
| Baker,Gregory J | 1 | 0 | 0 | 1 | 1 | 3 |
| Buzas,Peter L | 78 | 0 | 0 | 0 | 1 | 79 |
| Snyderman,Jonathan L. | 0 | 0 | 0 | 5 | 1 | 6 |
| Braumiller,Brian M | 0 | 0 | 0 | 1 | 0 | 1 |

*Val Santos*

Valerie Santos, MBA
Director, Health Information Management
West Florida Hospital
Pensacola, FL 32514
Phone: 850-494-5402
Fax: 850-494-6517

This message is confidential, intended only for the named recipient(s) and may contain information that is privileged or exempt from disclosure under applicable law.  If you are not the intended recipient(s), you are notified that any disclosure, copying, distribution, or action taken in reliance on the content of this email is strictly prohibited.  If you receive this message in error, or are not the named recipient(s), please notify the sender at the email address above and delete this email from your computer.

# Exhibit 3

**From:** Ray Gyarmathy
**Sent:** Friday, September 14, 2012 1:44 PM
**To:** David Williams
**Subject:** RE: West Florida Hospital T-Sheets- High Unbilled Amount--URGENT

The charts are included in the original forwarded e-mail attached to your response.

**From:** David Williams [mailto:David.Williams@cfl.rr.com]
**Sent:** Friday, September 14, 2012 1:38 PM
**To:** Ray Gyarmathy
**Subject:** Re: West Florida Hospital T-Sheets- High Unbilled Amount--URGENT

There was no attachment. Please re-send email with attachment.

**From:** Ray Gyarmathy
**Sent:** Friday, September 14, 2012 11:30 AM
**To:** gleesonc2@hotmail.com ; krabbedl@yahoo.com ; mrbee63@gmail.com ; jbchandler@cox.net ; burnellb@hotmail.com ; castellon@me.com ; eyelandgirl11@yahoo.com ; dmuthmd@aol.com ; erdoc2@me.com ; hekintz@yahoo.com ; hollywilsonmd@yahoo.com ; whytekirk@yahoo.com ; pa@hthmissions.com ; mtorresmd@me.com ; tampaerdoc@gmail.com ; Forster Gmail ; pjobrien@me.com ; pallenmd@aim.com ; pikumar@aol.com ; SLWalkerARNP@aol.com ; spojeny@gmail.com ; vs561229@comcast.net ; wescam01@aol.com ; david.williams@cfl.rr.com
**Cc:** Jaime Aleman ; Stephanie.East@hcahealthcare.com
**Subject:** RE: West Florida Hospital T-Sheets- High Unbilled Amount--URGENT

I just want to reiterate how important this is for all of us involved. It is imperative that these charts be finished as soon as possible. If you are having trouble getting remote access please get with the staff at West Florida so they can help you.

For our locums physicians, we are thankful for all you are doing for us at West Florida. However, I will have to hold up payment to your respective companies if there are charts outstanding. I know it is very busy but take the time to finish charting at the end of each shift especially your last shift as you may not return for a few days or longer.

Thanks,

Ray

Raymond Gyarmathy, MD, FAAEM
President
Titan Emergency Group
r.gyarmathy@titandoctors.com

---

**From:** Gregory.Makos@hcahealthcare.com [mailto:Gregory.Makos@hcahealthcare.com]
**Sent:** Friday, September 14, 2012 10:37 AM
**To:** gleesonc2@hotmail.com; krabbedl@yahoo.com; mrbee63@gmail.com; jbchandler@cox.net; burnellb@hotmail.com; castellon@me.com; eyelandgirl11@yahoo.com; dmuthmd@aol.com; erdoc2@me.com; hekintz@yahoo.com; hollywilsonmd@yahoo.com; whytekirk@yahoo.com; pa@hthmissions.com; mtorresmd@me.com; tampaerdoc@gmail.com; Forster Gmail; pjobrien@me.com; pallenmd@aim.com; pikumar@aol.com; Ray Gyarmathy; SLWalkerARNP@aol.com; spojeny@gmail.com; vs561229@comcast.net; wescam01@aol.com; david.williams@cfl.rr.com
**Cc:** Jaime Aleman; Stephanie.East@hcahealthcare.com
**Subject:** West Florida Hospital T-Sheets- High Unbilled Amount--URGENT
**Importance:** High

Good Morning Titan ER Physicians Group,

I wanted to make everyone aware of the email that we received this morning from West Florida Hospital relating to Incomplete/Deficient/Missing Patient Charts in T-system **(PLEASE SEE BELOW).** Stephanie and I have been making every effort to help keep this list short, however, we cannot do this alone.  Hopefully, this will help show just how important it is to make sure you are signing/locking your charts, and completing any requested addendums in a timely fashion.  We have now been urged to suggest to you that you complete all charts (including co-signatures for PA charts, which will be found under the "other assigned patients" tab in T-system next to the "my incompletes" tab) prior to the end of your shift.  If this causes you to work over at the end of your shift and you notice this continues to happen please check with Dr. Aleman to see if there are other ways to resolve this (additional staff, schedule overlapping, etc.).  This becomes even more important to those of you who are only on the schedule a few times each month.  **Also, it is very important to check your emails regularly for any addendum requests, etc (the ones provided to us from Titan Recruiting).**  Please let Stephanie or myself know of any questions and we will be more than happy to help you.  I will end by asking each of you to please log into the system at some point today and check for incomplete charts.  I have attached the remote access instructions, which include instructions for both PC and MAC computers.  Everyone should have been set up with the remote access upon starting their first shift.  If you encounter any type of system issues please call 850-494-3500 for additional support.  Make sure you are checking T-System, HPF, and CPOE.  I know that many of you are new to working at West Florida Hospital and that T-system has a bit of a learning curve.  We greatly appreciate your time and your hard work, and hopefully everyone has a better understanding of just how important this issue is on a daily basis.  Have a great weekend ahead.

2

**\*\*ALSO PLEASE KEEP IN MIND, IN MOST CASES BELOW IF THE HOSPITAL CANNOT BILL FOR THE PATIENT VISIT, TITAN CANNOT BILL FOR THE PATIENT VISIT\*\***

**\*\*If you have responded to our emails within the past few days regarding patient names that are still listed below, we appreciate it\*\***

Good Morning-
There are many T-Sheets that are on the Unbilled for missing and/or Missing the DX. If physicians are locking their T-Sheets at the end of the shift, we can prevent this list from growing each week. T-sheets will not automatically flow after a certain period at times if the account is not locked timely. Here's an updated list from the original email sent earlier this week. I do have the accounts that were resolved yesterday as they are still listed below

**Total: $536,828.90**

## REDACTED

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

Valerie Santos, MBA
Director, Health Information Management
West Florida Hospital
Pensacola, FL 32514
Phone: 850-494-5402
Fax: 850-494-6517

This message is confidential, intended only for the named recipient(s) and may contain information that is privileged or exempt from disclosure under applicable law.  If you are not the intended recipient(s), you are notified that any disclosure, copying, distribution, or action taken in reliance on the content of this email is strictly prohibited.  If you receive this message in error, or are not the named recipient(s), please notify the sender at the email address above and delete this email from your computer.

# Exhibit 4

## <u>Medical Records-----You need to sign charts in three places</u>

**The expectation of the Hospital & Titan is to have your charts signed within 72 hours.**

**There are three places to sign charts.**

- **T-System.** We will have this system until March 19th; at which time we will start the Pdoc system.

- **Meditech orders.** This is the section to sign orders. You need to check this portal twice or three times a shift. It is fast and easy. If you are off work for over 3 days, then check this area every two days for one week . Sometimes there is a delay in the orders crossing over. If you stay current in the Meditech order section; you will not have many charts in the HCare portal. HCare portal takes longer to sign the same orders than in the Meditech portal.

- **H-Care Clinical Portal.** This is the portal to sign charts which have exceeded the 96 hour signing rule or to fill in missing information such as a diagnosis. You need to check this area at least every 2 days when you work. If you are off work for over 3 days, then check this area every two days for one week . This will prevent you from having delinquent notices. *Even if you stay current in you stay current signing charts in Meditech – you will see orders to sign in this section.*

**Helpful information.**
  Need help?
  <mark>**Tsheet**</mark>

| CREATE NEW TEMPLATE | First contact with pt. |
|---|---|
| CREATE A NEW BLANK BUT THE SAME AS THE SELECTED USER | USE THIS WHEN ADDING YOUR OWN CARE NOTE<br>**** USED MOST OFTEN**<br>Example:<br>1) MLP adding a suture note to Physician pt. You do not need to complete the full history, physical exam. You can put the procedure only and if you want, a brief medical decision note.<br>2) Physician seeing a MLP pt. You just need a brief history, focus exam and your brief medical decision note. (You don't need to chart everything.). Open this note with the MLP staffs the patient with your after initial contact. |
| TAKE OWNERSHIP OF USER TEMPLATE | USE THIS WHEN TAKING THE CHART FROM A SCRIBE |
| TAKE A COPY OF THE USER TEMPLATE | **DO NOT USE THIS** |

- o **DON'T TAKE A COPY.** However, we want the two licensed providers to both be visible on the final chart. So, we need to "take a blank copy" when assuming care from another PA or doc. That will leave the prior documentation intact, and the second documenter can simply add in additional exams, medical decision making components, etc.

**How to sign charts- the Scribe will help you with this.**

## MEDITECH

1. Click on Sign.   This will bring up the "Physician Care Manager"
2. Click on the **blue** check mark – this will check all the boxes
3. Click on Next page
4. When no more "next pages", click Submit and put in the last four of your SSI.



## The Hcare Clinical portal

**From either at home or at work – look at the top of the screen.  You will see:**





1) Put in your pin (last four of your SSI) to access the charts
2) Click on the **check mark**
3) Click on **process all** and continue – then follow the prompts.
   a. A chart will have a yellow box- click on the box and then click **SIGN**
      i. If you can't find the yellow box, then scroll down or up; change pages.



      ii.
      iii. IMPORTANT – if your "sign" button is not lit up –hit the "next page" icon.
4) Do the above two steps  for "signature" & "missing text".  For "dictation";  you need to look at the chart – if it is not yours (which it usually is not ) – then click on "**decline**"